47 N.J. 251 (1966)
220 A.2d 189
IN THE MATTER OF THE PETITION OF MONMOUTH CONSOLIDATED WATER COMPANY UNDER R.S. 40:55-50, for a determination that the situation of a 1.5 M.G. water storage facility and pumping station and associated mains, pipes, fixtures and appurtenances in the Township of Middletown, in the County of Monmouth, New Jersey, is reasonably necessary for the service, convenience or welfare of the public (P.U.C. Docket No. 653-124), AND IN THE MATTER OF THE PETITION OF MONMOUTH CONSOLIDATED WATER COMPANY UNDER R.S. 40:55-1.19, ON APPEAL FROM A DECISION DENYING MINOR SUBDIVISION APPROVAL BY THE PLANNING BOARD OF THE TOWNSHIP OF MIDDLETOWN, IN THE COUNTY OF MONMOUTH, FOR A DETERMINATION THAT THE PROPOSED USE BY PETITIONER OF THE PREMISES IN QUESTION IS REASONABLY NECESSARY FOR THE SERVICE, CONVENIENCE OR WELFARE OF THE PUBLIC (P.U.C. DOCKET NO. 653-125).
TOWNSHIP OF MIDDLETOWN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY AND PLANNING BOARD OF THE TOWNSHIP OF MIDDLETOWN, APPELLANTS,
v.
BOARD OF PUBLIC UTILITY COMMISSIONERS, ETC., AND MONMOUTH CONSOLIDATED WATER COMPANY, ETC., RESPONDENTS.
The Supreme Court of New Jersey.
Argued March 22, 1966.
Decided June 6, 1966.
*255 Mr. Vincent C. DeMaio argued the cause for appellants Township of Middletown and Planning Board of the Township of Middletown.
Mr. William C. Davis argued the cause for respondent Monmouth Consolidated Water Company (Messrs. Starr, Summerill & Davis, attorneys; Mr. Davis of counsel and on the brief).
Mr. William Gural, Deputy Attorney General, argued the cause of respondent Board of Public Utility Commissioners (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney; Mr. Gural on the brief).
The opinion of the court was delivered by FRANCIS, J.
In this proceeding the Board of Public Utility Commissioners authorized Monmouth Consolidated Water Company to install a water storage tank, pumping station and the necessary fixtures and appurtenances at a specified location in the Township of Middletown, Monmouth County, New Jersey. Monmouth's application therefor was opposed by the township, and by Mrs. Helen Conrow and Mr. and Mrs. Richard Marsen, owners of property near the site, primarily on the ground that the proposed construction was prohibited by the municipal zoning ordinance. Following the board's order of approval, the objectors appealed and we certified the matter on our own motion prior to argument in the Appellate Division.
The Township of Middletown is a rapidly growing, predominantly residential community in Monmouth County. In 1950 its population was 16,203; by 1960 it had exploded to 39,675, a growth of 145%. The prognosis is that by 1975 the number will reach 65,000. Naturally the bourgeoning citizenry has brought an increase in the demand for water. To illustrate, the township consumed 896.8 million gallons in 1962; in 1964 it rose to 1200.4 million gallons. The maximum daily delivery increased from 5.6 million gallons on *256 June 10, 1962 to 7.9 million gallons on May 23, 1964. The minimum daily delivery rose from 1.1 million gallons on April 17, 1962 to 2 million gallons on October 2, 1964.
Monmouth is a public utility engaged in the business of selling water to the public in various municipalities in Monmouth County, including Middletown. The multiplying demand in Middletown imposed such a strain on Monmouth's plant as to induce a management decision that additional facilities were necessary. More specifically, it was decided that storage facilities should be provided in the township, to consist of a 1.5 million gallon storage tank and pumping station, with their associated fixtures, mains, pipes, etc. The proposed tank is to be a ground storage tank, cylindrical in shape, 40 feet high and 80 feet in diameter. The pumping station will be housed in a single building of face brick and stone trim, 38 feet long and 20 feet wide. It is the company's view that the tank is needed primarily to serve the northwest area of Middletown, but is required also for the entire township service area during peak hour periods. No one in the case questions the need and desirability of the additional facilities or of the proposed method of supplying the demand for water.
The company instituted a search for suitable and available property for location of the tank and pumping station. After encountering some refusals by owners to sell desirable land for the purpose, Monmouth succeeded in obtaining a contract for purchase of the site in question. It is part of a large parcel of undeveloped land, known as the Ellison tract, located on the east side of Middletown-Lincroft Road, a main thoroughfare in the township. The tract contains 38.765 acres and the Ellison home is the only structure on it. The Monmouth contract is for a lot roughly 250' x 250' or 1.165 acres, fronting on the Middletown-Lincroft Road and positioned in the extreme southwest corner of the Ellison tract; to the west across the road and to the south are undeveloped lands, and to the north and east is the remainder of the Ellison tract. Thus the tank site is surrounded by undeveloped *257 land. According to the plan approved by the Board of Public Utility Commissioners the tank when completed will be 110 feet from the center line of the Middletown-Lincroft Road, approximately 50 feet from the rear lot line, 20 feet from the northerly side line, and approximately 150 feet from the southerly side line. The pumping station housing will be 116 feet from the northerly side line, 130 feet from the rear line, 98 feet to the southerly side line and 90 feet from the center line of the Middletown-Lincroft Road. The width of that road is 33 feet which brings the tank to within 93.5 feet of its easterly edge, and the pumphouse only 81.5 feet therefrom.
Under the zoning ordinance of Middletown the Ellison tract as well as the surrounding area are in the R-30 residence zone, and the proposed use of the portion purchased by Monmouth is not permitted unless a special exception is granted by the Board of Adjustment. Applications designed to eventuate in such an exception were instituted before the Board of Adjustment and the Planning Board. The relief sought was denied. Thereafter Monmouth filed two petitions with the Board of Public Utility Commissioners, one under N.J.S.A. 40:55-50, and the other in the form of an appeal under N.J.S.A. 40:55-1.19 from the adverse action of the Planning Board in denying a minor subdivision approval covering the lot in question. We need not discuss the local proceedings because on the record here we are satisfied that the petition to the board under N.J.S.A. 40:55-50 provided a complete, original and independent avenue of remedy in the situation. See In re Application of Hackensack Water Co., 41 N.J. Super. 408, 415 (App. Div. 1956), and see, In re Public Service Electric & Gas Co., 35 N.J. 358, 372 (1961).
The statute N.J.S.A. 40:55-50 provides:
"This article [i.e., Article 3. Zoning, N.J.S.A. 40:55-30 et seq.] or any ordinance or regulation made under authority thereof, shall not apply to existing property or to buildings or structures used or to be used by public utilities in furnishing service, if upon a petition of *258 the public utility, the board of public utility commissioners shall after a hearing, of which the municipality affected shall have notice, decide that the present or proposed situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public." (Insertion ours)
In enacting this section the Legislature recognized that local municipal authorities are ill-equipped to comprehend adequately the needs of the actual and potential users of the utility's services beyond as well as within their territorial limits. The lawmakers knew that if the zoning power of a municipality were paramount, it would probably be exercised with an eye toward the local situation and without consideration for the best interests of the consumers at large in other communities whose convenience and necessity require service. The exemption also signifies an awareness that if the local authorities were supreme the Board of Public Utility Commissioners could not compel a utility to provide adequate service if the zoning ordinance conflicted with the need for expansion or extension of its facilities within the municipality. Such a negation of the plenary power granted to the board would seriously undermine its value as a legislative instrument to enforce the duty of utilities to serve the public convenience and necessity in whatever area they operate. The conclusion is inescapable that "public" in N.J.S.A. 40:55-50 means the public served by the utility and not the limited group whose interests are protected by a zoning ordinance. In re Public Service Electric & Gas Co., supra, 35 N.J., at pp. 371-372; N.Y. Central R.R. v. Ridgefield, 84 N.J. Super. 85, 93 (App. Div. 1964); In re Application of Hackensack Water Co., supra, 41 N.J. Super., at pp. 419-420. Obviously the Legislature intended the board to give broad and balanced consideration to all aspects of the general public interest and welfare and not merely to examine local interests which might be affected by utility operation.
Decision as to whether facilities should be enlarged or extended within a municipality, and, if so, where they should *259 be located, rests with utility management in the first instance. That decision, of itself, does not override the local ordinance if the site selected is zoned against the desired use. An application must be made to the board under N.J.S.A. 40:55-50 for a determination that the proposed structures as well as their planned location are reasonably necessary for the service, convenience or welfare of the public. In the absence of such application and its grant, the use restriction is binding on the utility. Yahnel v. Bd. of Adjustment of Jamesburg, 76 N.J. Super. 546, 553 (Law Div. 1962), affirmed 79 N.J. Super. 509 (App. Div.), certif. denied 41 N.J. 116 (1963).
The hearing before the board on the utility's petition to establish a discordant use in a prohibited zone was not intended by the Legislature to be simply a pro forma approval of management's decision. In re Application of Hackensack Water Co., supra, 41 N.J. Super., at p. 419. Otherwise the requirement in the statute for notice to the affected municipality (which was given in this case) would have no particular point. Further consideration of the matter should not be limited to the ordinary factors which govern a decision as to whether the public convenience and necessity will be served by a course of operation or conduct proposed by a utility. The issue is broader: (a) Is the projected deviation from the zoning ordinance sufficiently necessary for the convenience and welfare of the public in connection with the service provided by the utility to warrant its authorization; and (b): If so, can the impact of the discordancy on the locality be lessened by imposition of reasonable conditions designed to preserve aesthetic and other relevant zoning considerations?
In passing upon the application the board has ample authority as well as the duty to study the suitability of the locus chosen for the utility structure, the physical character of the uses in the neighborhood, the proximity of the site to residential development, the effect on abutting owners, its relative advantages and disadvantages from the standpoint of public convenience and welfare, whether other and equally *260 serviceable sites are reasonably available by purchase or condemnation which would have less impact on the local zoning scheme, and last, but by no means least, whether any resulting injury to abutting or neighboring owners can be minimized by reasonable requirements relating to the physical appearance of the structure, adequate lot size, front and rear set back lines as well as appropriate side lines regulating the positioning of the structure on the lot, and by proper screening of the facility by trees, evergreens, or other suitable means. The board should weigh all of these factors and while no controlling weight should be given to purely local considerations, they should not be ignored. Compare Washington Twp. v. Ridgewood Village, 26 N.J. 578, 584-585 (1958); Kozesnik v. Montgomery Twp., 24 N.J. 154, 176 (1957). And in our judgment there is no doubt as to its power to tailor the grant of approval of the site selected by the utility by attaching appropriate conditions and safeguards relating to the matters specified above.
At the hearing in this instance considerable testimony was introduced for and against use of the site selected by Monmouth for the tank and its incidentals. Alternate locations were discussed and considered. The local authorities and individual property owners had been given notice and were allowed full opportunity to be heard. As its opinion indicates, the board considered all the evidence concerning the location chosen for the new facilities and concluded that it was reasonably necessary and convenient for adequate water service. That finding is adequately supported by the record and there is no basis for judicial intervention or for a judicial declaration that Monmouth should be required to use a different site. In re Public Service Electric & Gas Co., supra, 35 N.J., at pp. 376-377. As a matter of guiding principle on site approval in this type of case, it seems necessary, however, to record our view that whenever alternate locations of substantially equal use value are reasonably available, the utility should be required to utilize the one *261 having the least capacity for adverse effect on the local zoning scheme.
Questions of substantial materiality other than propriety of the site selected were raised but not resolved by the Board's decision. They had to do with the size of plot proposed to be used in relation to the dimensions of the facilities, their placement with respect to the boundary lines of the property, and particularly, what screening or aesthetic devices could be employed to minimize the discordancy of the structures on the surrounding residentially zoned area.
Testimony was offered on both sides of the case indicating plainly the desirability of creating screening to lessen the impact of the tank and pumping station on the neighborhood landscape. There was no substantial disagreement on the subject. In fact one of the principal witnesses for Monmouth said that "screening should be provided," and if it were not done adjacent property would suffer depreciation. Moreover, another of its witnesses, the chief distribution engineer of the American Water Works Service Company, who had studied the project for Monmouth, indicated that ordinary landscaping such as seeding and the planting of ornamental shrubs and trees would provide adequate concealment. The township engineering witness recommended construction of an earth berm around the tank to hide it. This would be more expensive than landscaping and would require a larger lot, but he did not think the difference in cost unreasonable. In this connection it must be noted that Monmouth presented no specific plan either as to the type screening to be employed or how it could be accomplished on the limited area of the lot intended to be used. Further, as we have pointed out above, this lot is only 250 x 250 feet in size, and the huge tank is to be only 20 feet from the northerly side line, about 150 feet from the southerly side line (with the pumping station housing in between), 50 feet from the rear lot line, and 93.5 feet from the edge of the Middletown-Lincroft Road. One witness for the township, with some experience on the subject of landscaping, advanced the opinion that the *262 size of the lot, particularly at the side and front, would not allow enough room to permit trees of sufficient size to screen the tank.
The board made reference in its opinion to the size of the lot to be used, and to the screening suggestions discussed at the hearing. But beyond the passing statement, it made no specific ruling as to the adequacy of the former, nor did it impose any specific requirement or plan as to the latter. The record reveals that after entry of the order granting the application, the board directed a letter to Monmouth suggesting that "in the interest of good public relations, the company should do everything possible to minimize any adverse aesthetic effect in the construction and erection of the facility." And it "strongly urged" that the utility meet with local authorities and "discuss" plans and specifications for dealing with the matter. The intimation given to us at oral argument for this informal treatment was that the board is unsure of its authority to deal specifically with such problems as adequacy of lot size and need for screening, and to impose definite requirements with respect thereto.
As we have already indicated, the board not only has plenary authority to decide such matters, but has the duty to exercise it as well in cases like the present one. Only by doing so can both aspects of the public interest be served, i.e. the interest of the consumers being served and to be served by the utility within and without the affected municipality, and the interest of the local citizenry in the proper planning and zoning of land use in their township.
Under the circumstances, in our judgment the matter must be remanded for further consideration of, and definitive ruling as to (1) the adequacy of the 250' x 250' lot for the accommodation of the structures involved, having in mind particularly their planned positioning in the property, and (2) the type and extent of screening which must be utilized by the utility as a condition to the board's approval of the location of the new facilities. In this connection, the record rather persuasively reveals the inadequacy of the size of the *263 lot involved. The space remaining between the tank and the northerly side line, i.e. 20 feet, is plainly insufficient to permit any reasonable screening or buffer area between it and the adjacent owner's land. Moreover, we cannot say with any assurance on the present proof whether the front space between the proposed structures and the Middletown-Lincroft Road is sufficient to allow reasonable protective screening.
For the reasons stated the present order of the board is reversed and the matter is remanded for further consideration in light of the views expressed herein.
For reversal and remandment  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO.  6.
For affirmance  None.