100 N.J. Super. 1 (1968)
241 A.2d 15
IN THE MATTER OF THE PETITIONS OF PUBLIC SERVICE ELECTRIC AND GAS COMPANY, PURSUANT TO N.J.S.A. 48:3-17.6 FOR THE RIGHT TO EXERCISE THE POWER OF EMINENT DOMAIN, ETC., AFFECTING LANDS OF JOHN A. SCHROTH, ET AL.
APPEAL OF CITIZENS OPPOSED TO POWER TOWERS, READINGTON CHAPTER, INC., APPELLANT,
v.
PUBLIC SERVICE ELECTRIC AND GAS COMPANY, AND BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 1968.
Decided March 15, 1968.
*4 Before Judges GOLDMANN, KILKENNY and CARTON.
Mr. Thomas J. Beetel argued the cause for appellant (Messrs. Hunt, Faherty & Beetel, attorneys).
Mr. Charles A. Lamby, Jr. argued the cause for respondent Public Service Electric and Gas Company.
Mr. William Gural, Deputy Attorney General, argued the cause for respondent Board of Public Utility Commissioners of the State of New Jersey (Mr. Arthur J. Sills, Attorney General of the State of New Jersey, attorney; Mr. Leon S. Wolk, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by CARTON, J.A.D.
The Board of Public Utility Commissioners (Board) granted Public Service Electric and Gas Company (Public Service) the right to condemn certain lands for a 200-foot-wide right-of-way from a point in the Township of Holland in Hunterdon County near the Pennsylvania line to the Township of Branchburg, Somerset County. This right-of-way or corridor is to be used to construct overhead transmission facilities to transport bulk electric energy from Pennsylvania to several northeast states, including New Jersey. This portion of the route, together with the proposed northern branch extending from Branchburg to the New York border, compromises a part of a major power generation and transmission network known as the "Keystone Project."
The Keystone transmission facilities in this State will consist of steel powers varying in height from 82 to 192 feet, depending on the nature of the terrain, the spanning distance between towers being from 400 to 1940 feet. These towers will support 500,000-volt, three-phase transmission lines consisting of six aluminum cables.
*5 Appellant is the Committee Opposing Power Towers of Readington, Inc. (C.O.P.T. Readington), a nonprofit corporation of residents in the Readington area formed to voice opposition to the method of transmission and the design and route of this network. At the hearing before the Board, appellant and other interested parties asserted that the erection of the towers and the electric transmission system would adversely affect the aesthetic character of the lands through which the right-of-way passes and urged, among other things, that the cables should be placed underground, thus eliminating the need for the towers.
On this appeal appellant does not make any specific challenge to the factual findings of the Board, but charges that the Board, in arriving at its conclusions, failed to exercise various planning functions allegedly imposed upon it by statute. The manner in which it is claimed the board was remiss will be considered hereafter.

I.

BACKGROUND AND PROCEEDINGS BEFORE BOARD
A brief summary of the salient factual background of this controversy and the proceedings before the Board is necessary to understand and determine the issues raised on this appeal by C.O.P.T. Readington, the sole appealing party.
Early in 1965 Public Service, a New Jersey corporation supplying electricity to the public in 233 New Jersey municipalities, filed petitions with the Commission, pursuant to N.J.S.A. 48:3-17.6 and 48:3-17.7, to exercise the right of eminent domain to acquire interests in certain lands needed for a portion of the right-of-way between Holland Township and Branchburg. These petitions, together with notice of the time and place of the initial hearing, were served on the property owners. Notice was also served on the municipalities in which the properties are located, as well as on the counsel to the Governor, the Department of Conservation and Economic Development, and others. Pursuant to Board *6 directions, Public Service also published notice of the hearing in several newspapers in Hunterdon and Somerset Counties.
In August 1965 C.O.P.T. Tewksbury (not the appellant, but another nonprofit corporation organized generally for the same purpose as appellant) filed a petition, pursuant to N.J.S.A. 48:2-19 and 48:2-36.1, requesting the Board to compel Public Service to submit a complete report on "the feasibility of the method of transmission of electrical energy through the State of New Jersey and the feasibility of the entire route to be taken in New Jersey." C.O.P.T. Tewksbury had appeared at the outset of the hearings on the eminent domain proceedings. On September 28, 1965 its petition was consolidated with the eminent domain matters.
Appellant C.O.P.T. Readington was formed on November 12, 1965; and on January 24, 1966 (the date of the 27th hearing), over objection of Public Service, it was permitted to intervene.[1]
The Board conducted 37 hearings extending over some 18 months, during the course of which voluminous testimony was presented and 139 exhibits received into evidence. (37 volumes, consisting of 3,900 pages of testimony, have been submitted to the court for consideration on this appeal.) At the conclusion of the hearings the Board filed a 78-page opinion in which it determined that the relief sought by Public Service was in the public interest. In granting Public *7 Service the authority to exercise the power of eminent domain to acquire the rights-of-way requested in the petitions, the Board, as it was required to do, made numerous findings on the issues raised in the consolidated proceedings.

II.

FINDINGS AS TO REASONABLENESS OF TAKING UNDER N.J.S.A. 48:3-17.7
The Board made the statutory findings required by N.J.S.A. 48:3-17.7, including specific determinations that the taking was reasonably necessary for the service, accommodation, convenience or safety of the public; that the taking was compatible with the public interest, and that it would not unduly injure the owners of private property.
In its decision the Board reviewed at length the evidence which overwhelmingly demonstrated the need for the proposed facilities, and sketched the extent and character of the area served by Public Service and the underlying factors which pointed inexorably to the tremendously increased demand for electric power in the near future. The evidence showed that the company's service area has realized a high degree of diversified industrial, commercial and residential growth because of the availability of airport, rail, seaport and highway facilities; that population of the area had greatly increased, accompanied by a corresponding growth in sales of electricity, and that the need for reliable electric service to meet these rising demands was a major factor which led to the decision to build, in conjunction with the other companies, the system of extra high-voltage transmission lines. Such facilities are intended to deliver to New Jersey energy generated at low cost at coal fields in Pennsylvania and at the same time provide high-capacity inter-area ties. The Board, in referring to the famous northeast area blackout of 1965, strongly emphasized the importance of interconnection coordination, area inter-ties and power pooling, thus greatly enhancing the system reliability of Public Service and its *8 ability to render safe, adequate and proper service to its customers.
Noting that although nuclear power plants are becoming more economically competitive with other forms of electrical generation, the Board expressed the view that the concept of mine-mouth generation as exemplified by the Keystone Project should not be abandoned as obsolete. The location of the generating site in Pennsylvania, rather than locating new or expanding existing coal using plants in New Jersey, would also have the advantage of not contributing measurably to air pollution in New Jersey.

III.

FINDINGS AS TO FEASIBILITY OF PROPOSED OVERHEAD TRANSMISSION AND FEASIBILITY OF ROUTE
The Board found that the Keystone Project, as well as the Public Service proposal for the construction of overhead transmission facilities in New Jersey, was a reasonable and feasible means of transmitting electricity and that underground DC transmission as urged by C.O.P.T. Readington and others was not economically or technically feasible at the present time.
In arriving at this conclusion the Board reviewed in considerable detail the evidence as to the comparative cost of the underground and overhead lines and the technological considerations involved. It found that the costs of underground transmission would be at least 14 times greater than overhead, and that such a cost differential would be prohibitive. The Board referred to the numerous problems not yet resolved concerning the technical feasibility of constructing 500,000-volt DC transmission facilities underground. The major obstacles relate to power flow reversal and to the dissipation of heat generated in the cables by transmission of such high voltage. The rate of heat dissipation is affected by the type of insulating materials used to surround the *9 cables and the thermal resistance of the soil in which the cable is buried. The Board concluded that in the present state of the art, although there were many new developments and techniques in this field, the reliability and efficiency of the cable and equipment proposed for use in an underground system, even if available, had not been satisfactorily demonstrated. It was also pointed out that there was no substantial proof that such equipment would be readily available in the near future.
The Board also considered whether the company's method, plans and actions with respect to the entire route were feasible. Reference was made to evidence offered by Public Service that at least six routes through Hunterdon County were considered before it decided that the most feasible route for the Holland-Branchburg leg, considering cost and minimum damage to private property, would be a 200-foot right-of-way immediately adjacent to and abutting New Jersey Power and Light Company's right-of-way.
At the time of the hearing the exact location of the Branchburg-New York route was still tentative. Selection of the terminal point in Suffern was predicated upon the plan to connect with an inter-area tie at that point with the New York system. Since a straight line from Branchburg to the Suffern terminal passes through heavily congested areas, some deviation was necessary to meet the practicalities of acquisition of rights-of-way. Originally the tentative route passed east of Lake Hopatcong and Lake Mohawk. However, after a number of meetings were held between Public Service and various municipalities, planning boards and citizens' groups, the tentative route was changed to pass west and north of the lakes.
With respect to the Holland-Branchburg leg, the Board found that Public Service had met the burden cast upon it of submitting evidence that it had considered alternative routes in selecting the right-of-way, the availability of such routes, and the reasons why they were discarded in favor of the route finally chosen. It observed that Public Service had *10 made field investigations, utilized land surveys, paralleled existing rights-of-way where feasible, avoided heavily built-up areas where reasonably possible, and met with representatives of local interests in order to inform public officials and residents of the proposed route and to consider such alternate routes as they might suggest. The Board found the Holland-Branchburg route to be reasonable. It also concluded that the route presently proposed by the company from Branchburg to Suffern was reasonable.
At the conclusion of the hearings, the Board granted Public Service authority to condemn the properties required for its right-of-way and upheld the propriety of overhead transmission construction, as well as the feasibility of the route from Holland Township to Branchburg and the tentative route from Branchburg to New York (except for possible deviations to comply with conditions imposed in the order). In addition, it ordered Public Service to locate its towers, wherever practicable and feasible, so as to conform with the topography, thereby minimizing their effect upon the surrounding areas. It further directed that Public Service establish a program of initial and periodic painting of the towers to minimize their effect upon their surroundings; to employ nonuniform clearing of the right-of-way and, wherever possible, allow a maximum number of mature trees to remain standing; to landscape by means of planting low-growing species where the right-of-way was conspicuous from heavily traveled roads, and, wherever practicable and feasible, to permit special uses of the right-of-way for farming, recreation and other appropriate purposes. Public Service was also directed to submit, no later than 30 days from the date of the decision, an outline of the steps it proposed to take with respect to the implementation of the order.
Our review of the record satisfies us that there was more than sufficient credible evidence to support the Board's findings and conclusion. We conclude that its determination may not be disturbed.
*11 We thus limit our consideration to the specific legal issues raised on this appeal and to which we now turn.

IV.

THE LEGAL ISSUES INVOLVED
As we have already mentioned, appellant's attack on the decision of the Board relates principally to the scope of the Board's functions in the planning and zoning field. It charges that the Board failed properly to discharge the planning and zoning function committed to it by the Legislature.
With respect to the Board's planning function, appellant advances the thesis that the Legislature has mandated the Board to become "the State-wide Planning and Zoning Agency over Public Utility Construction." This broad concept of the Board's duty to function as a planning supervisor over public utilities proceeds from appellant's interpretation of R.S. 40:55-50. That section of the Municipal Zoning Act provides:
"This article or any ordinance or regulation made under authority thereof, shall not apply to existing property or to buildings or structures used or to be used by public utilities in furnishing service, if upon a petition of the public utility, the board of public utility commissioners shall after a hearing, of which the municipality affected shall have notice, decide that the present or proposed situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public."
We cannot agree that the Board has been given planning and zoning powers of the breadth and affirmative character thus attributed to it simply because of this provision. The quoted section of the Municipal Zoning Act merely specifies that neither the act nor any ordinance made under its authority shall apply to property, buildings or structures used or to be used by public utilities in furnishing service, where the Board, after hearing, shall determine that the proposed building or structure is reasonably necessary for the service, convenience or welfare of the public.
*12 Judicial construction of the provision has established that it is an unwritten exception to every municipal ordinance. Application of Hackensack Water Co., 41 N.J. Super. 408 (App. Div. 1956). We pointed out in N.Y. Central R.R. v. Borough of Ridgefield, 84 N.J. Super. 85, 93 (App. Div. 1964), that public utilities are subject to the municipal zoning power, but by R.S. 40:55-50 the Legislature created a method for resolving conflicts between different interests and policies  the "public" served by the utility on the one hand and the limited group benefited by the zoning ordinance on the other. "This exemption section expresses a legislative intent that, in the zoning field, at least some power over a utility is reserved to a municipality, subject to the supervisory authority of the Board [of Public Utility Commissioners] to declare the local regulation inapplicable," upon making the necessary determination prescribed therein. In re Public Service Electric & Gas Co., 35 N.J. 358, 373-74 (1961).
As we stated in Ridgefield (84 N.J. Super., at p. 94), R.S. 40:55-50 makes clear the legislative purpose that local zoning regulation, however beneficial, shall be subordinate to the broader public interest served by the public utility.
Where the authority of that provision is invoked by the public utility, the Board has the power and the duty to consider the suitability of the site chosen for the proposed structure, the physical character of the uses in the neighborhood, the proximity of the site to residential development, the effect on abutting owners, and similar zoning considerations. In re Monmouth Consolidated Water Co., 47 N.J. 251 (1966). Justice Francis' opinion in the latter case described the nature and scope of the Board's duty in such a proceeding:
"The hearing before the board on the utility's petition to establish a discordant use in a prohibited zone was not intended by the Legislature to be simply a pro forma approval of management's decision. * * * Further consideration of the matter should not be limited to the ordinary factors which govern a decision as to whether *13 the public convenience and necessity will be served by a course of operation or conduct proposed by a utility. The issue is broader: (a) Is the projected deviation from the zoning ordinance sufficiently necessary for the convenience and welfare of the public in connection with the service provided by the utility to warrant its authorization; and (b): If so, can the impact of the discordancy on the locality be lessened by imposition of reasonable conditions designed to preserve aesthetic and other relevant zoning considerations?" (at p. 259)
We note that R.S. 40:55-50 by its terms does not become operative until the public utility files a petition with the Board on notice to the municipality seeking exception from the zoning regulations. That section cannot be read to authorize or direct the Board to conduct an inquiry on its own initiative as to whether the proposed transmission system adversely affects the zoning regulations of the municipalities through which the lines pass. Nor was the filing of such a petition a pre-condition under the existing statutory scheme to the Board's exercise of its eminent domain jurisdiction or its jurisdiction invoked by Tewksbury C.O.P.T.'s petition to investigate the feasibility of overhead as opposed to underground transmission and the feasibility of the route.
In the event that any conflict between the proposed project and any valid zoning regulation is shown to exist, Public Service must still proceed under R.S. 40:55-50 for the necessary relief. Hindsight may demonstrate that time, energy and expense might have been saved had the utility initiated inquiry to ascertain whether exceptions would be required under this provision and filed the necessary petitions in order that they might be considered in connection with these proceedings. Indeed, it would seem to us from a practical standpoint that the Board should consider adopting a procedure applicable to future cases of this kind whereby it may be ascertained at the outset of the proceeding whether the filing of petitions under R.S. 40:55-50 is contemplated. The Board may then make provision for a hearing of such proceeding along with the main proceeding if such course of action is indicated.
*14 Even though R.S. 40:55-50 is not applicable here, it does not follow that the Board may take too narrow a view of its own power and ignore planning and zoning considerations in exercising its investigatory function under R.S. 48:2-19 and 48:2-36.1. In In re Public Service Electric & Gas Co., 35 N.J. 358 (1961), the Court said:
"It [the Board] has an inherent obligation of a primary and fundamental nature to protect the public interest in the matter of the service by utilities, not only in relation to the customer, but also from the standpoint of the impact of the method of service on other segments of the public as well and it must always be affirmatively alert to discharge that responsibility." (at p. 381)
These considerations are identical with those applicable under R.S. 40:55-50.
We do not read this language of the court as an expression that the Legislature has imposed upon the Board an affirmative role of planner on a regional basis, in the same way that the Legislature has conferred planning functions upon county and municipal planning agencies, on a more limited geographical basis. Rather, we interpret the quoted statement as expressing the view that the Board, in exercising its powers in situations such as this, must take into consideration not merely the engineering and economic aspects of the project, but also planning considerations, including those of an aesthetic character, in the balancing of interests.
Thus, the responsibility rests with the management of the public utility in the first instance to determine whether a project shall be undertaken, as well as the extent and character of the facilities to be constructed, and their location. Cf. Monmouth Consolidated Water Co., 47 N.J. 251, 259 (1966). Such a decision does not of itself determine that the project satisfies the criteria of In re Public Service Electric & Gas Co., supra, any more than it establishes the feasibility of the project or the necessity in the public interest of the proposed facilities. The Board still retains general *15 supervisory control of all aspects of such project on a broad basis.
Our review of the record in this case satisfies us that the Board, in arriving at its determination, did take into consideration all of the pertinent factors, including the impact of the proposed project on the community.
Public Service initiated its planning of the Holland-Branchburg leg of the right-of-way in 1962. The record establishes that it laid out the route of the transmission line after examination of area photographs, geodetic maps and land surveys. It considered the use of an existing right-of-way of the New Jersey Power & Light Company and the acquisition of additional width to form the 200-foot strip deemed necessary for the facilities. However, negotiations were unsuccessful in this direction because New Jersey Power & Light Company intends to make use of its right-of-way in the near future. Ultimately Public Service determined to parallel an existing right-of-way of that company in order to use a common corridor and cause a minimum severance of properties. Deviations were necessary in some instances in order not to interfere unduly with buildings and other improvements.
There was evidence that it considered and examined at least six routes through Hunterdon County before reaching the final decision as to the location of this route which is about 22.8 miles in length. With respect to the still tentative Branchburg-New York leg of the Keystone Project, the proofs showed that significant route alterations were made as a result of numerous meetings between Public Service and local interested parties.
The utility presented evidence before the Board at great length as to the need for the proposed transmission facility, as to the feasibility of underground as against overhead installation, the feasibility of the entire route, the investigations and efforts of the utility, its various decisions and the bases for them. The Board afforded a full opportunity to all interested parties to be heard and allowed a complete *16 exposure of all matters of fact and expert opinion by all parties on the many facets of the project. Witnesses testified on behalf of appellant, including the Director of the Hunterdon County Planning Board. Notice of the proceeding had been given to all municipalities and counties involved. It cannot be claimed that anyone who had an interest in the matter was denied an opportunity to be heard. The record demonstrates the contrary.
It may be noted that the Board's decision was not a blanket approval of the project as submitted by Public Service. The Board referred to the factors considered by the company in selecting the route from Branchburg to Suffern, commenting that consideration had been given to the use of existing rights-of-way and the possibility of a major jetport in the Bowling Green Mountain area and land acquisition problems in the more developed areas. But it also ordered Public Service to consider the possibility of using certain railroad rights-of-way suggested by Mrs. Tatton, the secretary of appellant, where they were suitable for this use, and to consider conforming the route to the contour of the terrain in developing the final location of the route.
C.O.P.T. Readington refers to Scenic Hudson Preservation Conference v. Federal Power Com'n, 354 F.2d 608 (2d Cir. 1965), as authority for its contention as to the Board's planning duty. Scenic Hudson involved judicial construction of the Federal Power Act, 16 U.S.C.A. § 803(a), a provision which confers much broader powers upon the Federal Power Commission than are conferred upon the New Jersey Board under our statutory scheme.
Appellant's further contention that the decision of the Board was made without the benefit of consultation with the Division of Regional Planning, Department of Conservation and Economic Development, finds no support in the record. The claim here is that because the Division is charged with promoting the "orderly development of the State's physical assets" (N.J.S.A. 13:1B-15.52), the Board must *17 "co-ordinate" with the Division on matters such as the Keystone Project.
The Board decision stated:
"Since the outset of these proceedings the Department of Conservation and Economic Development was on notice with respect thereto. Furthermore, COPT Readington was informed that Commissioner Roe would be heard on any day that he chose to appear at the hearings and, as a matter of fact, a date was set for that specific purpose. The Commissioner did not appear, but on February 10, 1967 submitted to the Board a statement he delivered on May 4, 1966 before the Senate Committee. This is contained in Exhibit OJ-12. Accordingly, the Commissioner's `views on this subject' are before the Board, and essentially are that it would be in the public interest for pending Federal legislation to be adopted providing for an intensive program of research and development with respect to the placing of electric transmission lines underground. * * *"
As we have pointed out, the Board recognized the impact of overhead towers and lines on aesthetics, but concluded the techniques involved in such underground transmission had not yet reached a point where the feasibility of such installation had been established. As the Board remarked, the Commission supplied no current remedies which would lead to a different conclusion.
Appellant also complains about the procedure followed in carrying out the Board's decision. On June 28, 1967 Public Service submitted to the Board by letter "an outline of the steps it proposes to take with respect to the implementation of the Orders of the Board * * *." This letter was in response to six orders set forth at the end of the Board's decision and summarized above, the essence of which is that Public Service take all measures possible to minimize the adverse effects of its power towers. Appellant claims that it was denied due process in that it was not afforded an opportunity to be heard on the contents of this letter. The Board, it asserts, should have granted a further hearing on its own motion to consider the contents of this letter.
So far as the record shows, appellant never asked to be heard. Consequently, it cannot be said that appellant was denied an opportunity to be heard.
*18 The letter was simply a proposal for meeting the Commissioners' directions. The record does not show that the steps outlined by Public Service were approved by the Board or whether they have been effectuated. If appellant wishes to oppose Public Service's suggestions as improper or inadequate, it may file its objection with the Board. The Board may consider and act on such complaint in the light of the circumstances.
Appellant's argument that the Board may have been without jurisdiction in this case is frivolous. It seems to contend that the Keystone Project involved the sale of electric energy in interstate commerce and consequently falls under the jurisdiction of the Federal Power Commission by reason of 16 U.S.C.A. § 824(b). This argument misconceives the purposes of the present proceeding, which was to determine whether Public Service could exercise its power of eminent domain on property it was unable to acquire by agreement of the owners. The federal enactment contains no provision empowering the Federal Power Commission to grant the authorization sought in this action by Public Service. That statute concerns rates, consolidations, purchase of securities, issuance of securities, etc.  none of which is involved here. There is no conflict between state and federal law. The Board has jurisdiction.
Finally, we see no merit in the argument that the Board considered matters outside the record.
Affirmed.
NOTES
[1] In its decision the Board points out that the residents of Readington, the township from which appellant's organization is drawn, were aware well in advance of the proceedings of the plan to construct the proposed transmission lines as well as of the start of these proceedings, and that the chairman of C.O.P.T. Readington by letter informed the Board on January 3, 1965 that its members had been interested in the project for well over a year. The Board also alluded to the fact that the secretary of this organization had appeared pro se and attended all but a few of the earlier hearings. The record discloses that on August 4, 1965 an appearance was entered in the proceedings by the township attorney on behalf of Readington Township.