Public Utilities Commission
No. 84-048

## APPEAL OF MILFORD WATER WORKS
### (New Hampshire Public Utilities Commission)

February 21, 1985

*Brown & Nixon P.A.*, of Manchester (*Leslie C. Nixon* on the brief and orally), for the Milford Water Works.

*Gregory H. Smith*, attorney general (*Ronald F. Rodgers*, assistant attorney general, on the brief and orally), for the State.

DOUGLAS, J.   This is an appeal by the Milford Water Works (utility) for relief from two conditions contained in an order by the New Hampshire Public Utilities Commission (PUC) granting the petition of that utility to exempt it from the zoning ordinances of the town of Amherst with regard to the laying of pipes from a well owned by the utility and located in Amherst to the utility's customers in Milford. We hold that the PUC had the authority to impose the contested conditions and that they are not unreasonable.

The Milford Water Works has been owned and operated by the town of Milford since 1890. It became a public utility in 1960 pursuant to RSA 38:12 and RSA 374:22 when it extended its lines and service into a limited area of the town of Amherst, separate and distinct from the location involved here.

Until February 1983, Milford drew its water from three wells, all located in the town of Milford, with a total pumping capacity of 1,100 gallons per minute. In anticipation of future demand, Milford planned to construct a fourth well, which was projected to supply an additional 500 gallons per minute.

In February 1983, the New Hampshire Water Supply and Pollution Control Commission (WSPCC) discovered, through routine sampling, that one of Milford's three wells had unsafe concentrations of volatile organic chemicals and ordered that well closed. The WSPCC further ordered the utility to abandon its plan to construct the proposed fourth well because of possible contamination. This order caused Milford to lose 500 gallons per minute, or between 40 and 45 percent of its current water supply, in addition to losing the projected 500 gallons per minute from the proposed well. Milford

implemented emergency water rationing and began an immediate search for an additional water supply.

Studies conducted by the WSPCC and by a consulting firm hired by Milford indicated that there were no potential well sites within the town of Milford which would likely be free of pollutants. Both the WSPCC and Milford's consultants advised that the only adequate and safe site for a new well would be on land in Amherst, owned by the town of Milford, known as the Curtis Farm.

The Curtis Farm fronts on the Souhegan River, which at that point forms the boundary between Milford and Amherst. Tests indicated that the projected well field could support two gravel-packed wells that would pump 1,100 gallons per minute.

The utility obtained the necessary permits from the WSPCC, pursuant to RSA 149:8-a, and from the State Wetlands Board, pursuant to RSA 483-A:1 (Supp. 1983). Construction began immediately on both wells. The utility did not, however, seek the PUC's approval to begin construction in Amherst before construction commenced, as required by RSA 374:22.

The first well came "on-line" on July 16, 1983, although the second was still under construction at the time of the PUC hearing. The pipeline connecting the wells to the utility's customers extends approximately 400 feet to the Souhegan River and then about another 100 feet across the river to a pumping station on the Milford side.

In compliance with a condition of WSPCC approval of the project, the utility dug seven monitoring wells, the purpose of which was to observe the water table and measure the impact of the Curtis Farm wells on the surrounding aquifer.

Prompted by concern about the effects of the Curtis Farm wells upon their own water supplies, seventy-nine neighboring Amherst residents formed a group called United Souls Urging Responsible Precaution with the catchy acronym USURP and, in typical American fashion, filed an equity petition in Hillsborough County Superior Court naming the Town of Milford as respondent. As a result of that petition, a settlement agreement was reached on July 18, 1983, wherein Milford agreed to apply to the PUC pursuant to RSA 31:62 for an exemption from the zoning ordinances of Amherst for the laying of pipes. The Town of Milford further agreed to install two additional monitoring wells and to limit the draw from the Curtis Farm well to 600,000 gallons per day until the PUC rendered its decision.

On July 25, 1983, after the project had been substantially completed, the Town of Milford, on behalf of the utility, petitioned the PUC for a ruling pursuant to RSA 31:62 that the construction of certain structures, including pipelines, wells, well houses and pump-

ing equipment over an expanse of approximately 400 feet within the confines of the town of Amherst, was reasonably necessary for the convenience and welfare of the public and that, accordingly, the above described structures were exempt from the zoning ordinances of Amherst.

On September 6, 1983, a hearing was held in each of the two affected towns. Both Amherst and Milford presented expert testimony, and members of the public voiced their concerns regarding the possible adverse effects of the Curtis Farm wells on the ground water supplies affecting neighboring wells. Although expert testimony indicated that such effects would be "minimal," testimony by numerous residents living within 2,500 feet of the Curtis Farm wells indicated a possible causal relationship between pumping from the Curtis Farm well then in operation and substantial drops in water levels experienced in their wells, ponds and streams.

On October 28, 1983, the PUC, by Order No. 16,737, granted the town's petition for exemption from the Amherst zoning ordinances under RSA 31:62, but attached certain conditions. The utility was required to: 1) maintain and monitor twice weekly nine test wells and make the results from such monitoring available to the selectmen of Amherst; 2) establish an emergency water supply within twenty-four hours to any person residing within 2,500 feet of the Curtis Farm wells whose water supply should fail, pending either construction of a permanent service connection or a determination by the PUC that the utility did not cause such failure; and 3) provide a permanent pipeline and hookup to any such person free of charge unless the utility could demonstrate that some factor other than the Curtis Farm well pumping caused the failure.

The utility did not contest its obligations regarding the test wells, but requested a rehearing on the other two conditions. The utility's motion for rehearing was denied by the PUC on December 30, 1983, by Supplemental Order No. 16,834.

The utility appealed to this court pursuant to RSA 541:6. It argues that the conditions relating to its obligations to provide emergency service to neighboring residents whose water supplies may fail, and to provide permanent hookup free of charge unless it can demonstrate that such failure was not related to the Curtis Farm wells, are unlawful and unreasonable.

The utility contends that the PUC exceeded its authority in imposing these conditions because RSA 31:62 gives the PUC power *only* to grant or deny an exemption from local zoning ordinances and contains no provision for the imposition of accompanying conditions. It further argues that the PUC had no authority under its general supervisory powers to attach such conditions.

The pertinent part of RSA 31:62 states:

"Structures used or to be used by a public utility may be exempted from the operation of any regulation made under this subdivision, if upon petition of such utility the public utilities commission shall after a public hearing decide that the present or proposed situation of the structure in question is reasonably necessary for the convenience or welfare of the public."

In interpreting a very similar statute, the Supreme Court of New Jersey stated that the purpose of the exemption provision is to ensure that a variety of conflicting local interests will not impede services provided by public utilities to consumers, particularly in other municipalities, to the detriment of the best interests of the public as a whole. *In re Monmouth Consolidated Water Co.*, 47 N.J. 251, 257–58, 220 A.2d 189, 192 (1966); *accord Pereira v. New England LNG Co., Inc.*, 364 Mass. 109, 119–21, 301 N.E.2d 441, 448 (1973). The New Jersey court further noted that the exemption provision was necessary to ensure that the agency which supervises public utilities has the authority to compel a utility to provide adequate service even where a zoning ordinance conflicts with the need for expansion or extension of utility services within a community. *In re Monmouth Consolidated Water Co., supra* at 258, 220 A.2d at 192.

However, the fact that the exemption statute "makes clear the legislative purpose that local zoning regulations . . . shall be subordinate to the broader public interest served by the utility" does not mean that local interests are not to be taken into account. *In re Petition of Public Service Electric and Gas Co.*, 100 N.J. Super. 1, 12, 241 A.2d 15, 20 (1968). Rather, the New Jersey Supreme Court has said:

"In passing upon the application the board [of Public Utility Commissioners] has ample authority as well as the duty to study the suitability of the locus chosen for the utility structure, the physical character of the uses in the neighborhood, the proximity of the site to residential development, *the effect on abutting owners,* its relative advantages and disadvantages from the standpoint of public convenience and welfare, whether other and equally serviceable sites are reasonably available by purchase or condemnation which would have less impact on the local zoning scheme, and last, but by no means least, whether any resulting injury to abutting or neighboring owners can be minimized by reasonable requirements relating to the physical appearance of the structure, ade-

quate lot size, front and rear set back lines as well as appropriate side lines regulating the positioning of the structure on the lot, and by proper screening of the facility by trees, evergreens, or other suitable means. The board should weigh all of these factors and while no controlling weight should be given to purely local considerations, they should not be ignored."

*In re Monmouth Consolidated Water Co., supra* at 259–60, 220 A.2d at 193 (emphasis added).

▆▆ Just as reasonable conditions may be attached by a zoning board of adjustment to approval of a variance to a zoning ordinance, *Carter v. Nashua,* 113 N.H. 407, 417–18, 308 A.2d 847, 854 (1973), or by a planning board to approval of a site plan, *Sklar Realty, Inc. v. Town of Merrimack,* 125 N.H. 321, 328, 480 A.2d 149, 152 (1984), so too may the PUC attach reasonable conditions in consideration of the interests of local residents when it grants a utility's petition for exemption from zoning ordinances pursuant to RSA 31:62. *See In re Monmouth Consolidated Water Co.,* 47 N.J. at 259–60, 220 A.2d at 193.

▆▆ We hold, therefore, that the PUC rightfully considered the concerns of local residents when it granted the utility's petition and that the conditions attached to its order were within its powers under RSA 31:62. Because we hold that the PUC had authority under RSA 31:62 to impose the contested conditions, we need not address whether the more general supervisory powers of the PUC contained in RSA chapter 374 also authorized such an imposition.

The utility further argues that regardless of what authority the PUC might otherwise have had, its jurisdiction was preempted in this case because the potential problems with which the disputed conditions relate are subject to the jurisdiction of two other agencies: the New Hampshire Wetlands Board and the New Hampshire Water Supply and Pollution Control Commission. The Milford Water Works was required to, and did, receive permission from both of these agencies under RSA 483-A:1 (Supp. 1983) and RSA 149:8-a, respectively, before it began construction on the Curtis Farm wells. These agencies are charged with protection of surface waters, ground water and wetlands. The utility argues that it is these agencies which have expertise with regard to depletion of water resources and that, if conditions regarding the utility's obligation in the event of failure of private wells surrounding the Curtis Farm well could have been imposed at all, they could only have been imposed by either the wetlands board or the WSPCC.

The utility views the jurisdiction of the PUC too narrowly. Even if the wetlands board or the WSPCC could have imposed conditions such as those in dispute here, it does not follow that the PUC's jurisdiction over such matters was necessarily preempted by such authority. Rather, the PUC, the wetlands board and the WSPCC are three State agencies with separate concerns which have concurrent jurisdiction over the Curtis Farm well project. Among the concerns of the wetlands board is the protection of lands which are under and which border "surface waters," including rivers. RSA 483-A:1-a, II, RSA 483-A:1-b. Because the Curtis Farm borders the Souhegan River and pipes from the Curtis Farm wells must cross that river in order to connect the well to water users in Milford, the utility was required to get permission from that agency. The wetlands board may condition its approval upon "the installation of bulkheads, barriers, proper retention and/or containment structures to prevent subsequent fill runoff back into waters or other protective measures." RSA 483-A:3.

The WSPCC is charged with the protection of surface and ground waters, particularly from the effects of pollution. RSA 149:4. Any person proposing to dredge, undertake construction, or in any other way significantly alter the character of the borders of surface waters of the State, is required to get permission from the WSPCC before such a project is begun. RSA 149:8-a. The WSPCC may attach terms and conditions to its grant of permission in order to ensure such protection. RSA 149:8-a.

As discussed previously, the PUC is empowered under RSA 31:62 to consider the health and safety of local residents when a utility petitions the PUC under that statute. On the basis of that statute, the PUC had jurisdiction to condition its approval of the utility's petition in light of such considerations. Since the conditions imposed by the PUC did not involve protection of surface waters, ground water or wetlands, areas of concern to the wetlands board and the WSPCC, but instead related to preservation of a water supply to local residents who might be affected by a utility's well construction project, an area of concern for the PUC under RSA 31:62 and RSA 38:12, we hold that the PUC's authority was not preempted in this case by any other State agency.

The PUC may well not have been able to *deny* approval of the Curtis Farm wells project *solely* on the basis of the potential adverse effects it might have on ground water, since the WSPCC had determined that the likely effect was "minimal" and since this was more its area of expertise. *Cf. Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062, 1068, 454 A.2d 435, 438 (1982) (findings of fact of the site

evaluation committee on siting, land use, and air and water quality are binding on the PUC, which issues or denies certificate of site and facility for proposed Seabrook nuclear project after finding that certain requirements have been satisfied). Nevertheless, the PUC may take into account other testimony and considerations and attach terms and conditions to ensure protection of those interests over which the legislature has given it jurisdiction.

The utility further contends that the PUC had no authority to attach the conditions in dispute here since, by doing so, it determined the rights of private parties, a solely judicial function. We find this argument to be without merit.

■■ As with other administrative agencies, the PUC routinely performs judicial functions. The legislature "created the public service commission [now the public utilities commission] as a State tribunal, imposing upon it important *judicial duties* and endowing it with large administrative and supervisory powers." *Parker-Young Co. v. State*, 83 N.H. 551, 556, 145 A. 786, 789 (1929) (emphasis added). Further, "[t]he growth of administrative boards with dual governmental functions has long been accepted as not inconsistent with the provisions of our Constitution requiring separation of the legislative, executive and judicial powers." *Petition of Boston & Maine Corp.*, 109 N.H. 324, 326, 251 A.2d 332, 335 (1969).

■■ The PUC's order may affect private rights so long as its determination is related to its regulatory functions. *Id.* at 327, 251 A.2d at 335 (citing *Opinion of the Justices*, 87 N.H. 492, 494, 179 A. 344, 346 (1935)). The PUC had jurisdiction over the Milford Water Works and its construction of the Curtis Farm well project under RSA 38:12, RSA 374:22 and RSA 31:62. The conditions attached to its order were lawful incidents of its regulatory powers.

■ The utility next contends that, even if the PUC had authority to impose the contested conditions, they are unreasonable as a matter of law in that they are not supported by adequate evidence. "Under RSA 541:13, the PUC's findings are presumed reasonable and its order will not be overturned unless [the utility] can show by a clear preponderance of the evidence that it is unjust or unreasonable." *Appeal of Granite State Elec. Co.*, 121 N.H. 787, 791, 435 A.2d 119, 121 (1981).

■ The PUC found that pumping from the Curtis Farm wells could deprive neighboring wells of their water supplies and that consideration of the public welfare and convenience required imposition of these conditions in order to lessen the impact of those wells

on the surrounding community. Supp. Order No. 16,834. There is a reasonable basis for this conclusion in the record.

Although expert testimony from hydrologists indicated that the effect of the Curtis Farm wells on surrounding private wells would be "minimal," none of the experts stated that there would be *no* effect or that the Curtis Farm wells absolutely would not cause neighboring wells to go dry. Additionally, many community members testified to marked drops in water levels since the first Curtis Farm well went into operation. At the time of the hearing, only 400 gallons per minute was being drawn from the first Curtis Farm well. When the second well goes on-line, this output will increase to 1,100 gallons per minute. The PUC concluded that the impact on private wells could be exacerbated when the second Curtis Farm well is put into service. Supp. Order No. 16,834. There was also testimony regarding the depletion of neighboring wells in another town when the municipal well was put on-line, even though previous tests had indicated there would be no effect on ground water.

The PUC conditioned its approval of the operation of the two Curtis Farm wells on the utility's obligation to supply emergency water service to property owners whose water supplies may fail after the Curtis Farm wells begin full operation. The PUC found it more in the public interest to impose this condition than to require cessation of operation of the Curtis Farm wells. We cannot say that this is unreasonable, particularly given the absolute necessity of water.

The PUC's other condition, relating to the obligation of the utility to provide for permanent hookup of water service, free of charge, if a private well should fail, unless the utility can prove that such failure is not due to the operation of the Curtis Farm wells, is also reasonable under the circumstances. The utility has nine test wells which, under the PUC order, it must monitor twice weekly. The utility does not contest its obligations in this regard. Monitoring wells enables the utility to measure the impact of its wells on the ground water flowing through the surrounding aquifer. The PUC found that data from the test wells could help determine whether depletion of private wells is causally connected to pumping from the Curtis Farm wells and could also provide advance notice of impending drawdowns. Supp. Order No. 16,834. From this the PUC reasonably concluded that the utility is in a much better position to prove or disprove any alleged effect of the Curtis Farm wells on private wells than are individual private well owners.

The conditions imposed by the PUC were within its authority and were not unreasonable or unjust. We therefore affirm its order.

*Affirmed.*

KING, C.J., did not sit; the others concurred.