84 N.J. Super. 85 (1964)
201 A.2d 67
NEW YORK CENTRAL RAILROAD COMPANY, A DELAWARE CORPORATION DOING BUSINESS IN THE STATE OF NEW JERSEY, PETITIONER-APPELLANT,
v.
BOROUGH OF RIDGEFIELD, RESPONDENT, AND BOARD OF PUBLIC UTILITY COMMISSIONERS, RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
NEW YORK CENTRAL RAILROAD COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 18, 1964.
Decided May 29, 1964.
*88 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. Archibald S. Alexander, Jr. argued the cause for appellant (Messrs. Lum, Biunno & Tompkins, attorneys; Mr. Alexander, on the brief).
Mr. James A. Major argued the cause for respondent Borough of Ridgefield (Mr. Edwin A.A. Muller, attorney; Mr. Major, of counsel).
Mr. Richard F. Green, Deputy Attorney General, argued the cause for respondent Board of Public Utility Commissioners (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney; Mr. Green, on the brief).
The opinion of the court was delivered by KILKENNY, J.A.D.
New York Central Railroad appeals from a dismissal without prejudice of its application to the Board of Public Utility Commissioners for an order under R.S. 40:55-50 that the zoning ordinance of the Borough of Ridgefield should not apply to the railroad's contemplated use of its existing property in that municipality.
By order of this court, two actions against the railroad now pending in the municipal court of Ridgefield for alleged violations of the local zoning ordinance were consolidated with the basic appeal so that we might review at the same time the validity and applicability of the challenged ordinance and thus, possibly, make a single disposition of all matters in issue, involving as they do common questions of law.
The railroad owns a freight yard in Ridgefield, adjacent to its tracks and facilities there, known as Bellman's Yard. *89 Though the yard can handle freight generally, its main use since the fall of 1961 has been the handling of new automobiles shipped by rail to that point on railroad flatcars of the bi-level and tri-level type, each carrying from 12 to 16 automobiles. The automobiles are not crated. They contain a small quantity of gasoline so that they may be taken off the railroad cars on ramps, sorted, washed, and reloaded within a matter of a few days on highway automobile carriers for delivery to consignees. On the present eight-acre area used for this purpose, about 1,000 new automobiles are present each day, those moving out from day to day on the highway carriers being replaced by others arriving on railroad cars.
The volume of this railroad business has been on the increase at this yard. In January 1962 the railroad handled 318 carloads monthly at this point. By June 1963 that figure had increased to 1,231 carloads. The railroad can get more of this business from other automobile manufacturers, if it will pave additional areas in this freight yard. The companies shipping their new automobiles require that they be placed on paved land. This additional business would bring "over a million dollars of revenue to the railroad," according to Donald Chickering, manager of the railroad's "Automobile Industry Services."
Bellman's Yard is more than half a mile from any residential areas of Ridgefield, being separated from these areas by a substantial portion of the Industrial F district, as well as by Manufacturing E district and Business D district. This freight yard is in Industrial F district, a flat swampy area through which several shifting creeks run. On built-up stretches rising from the bulrushes and mire, the railroad tracks and the New Jersey Turnpike traverse the swamp. A generating station of the Public Service Electric and Gas Company is nearby the area in question and power lines run criss-cross over this industrial district. The terrain is not generally adaptable to the construction of industrial establishments, except at great expense. The area is very suitable for the use to which it is being put  a railroad freight yard.
*90 The freight yard is presently equipped with a variety of facilities required for transferring autos from rail cars to highway carriers. There are side-tracks and yard tracks. Contiguous to the tracks, there is paving. Embedded in the paving are rails for the guidance of movable ramps used to take autos off the rail cars. Some areas of the paving, used for driving autos onto trucks, are pitched by grading fill material to a height of about three and one-half feet and butted off at the high end with stacked railroad ties. There is a building where Central's personnel works, and part of which is used to wash autos before loading them on trucks. The highway carrier personnel also use the building, which is equipped with telephones and toilets. In and around the paving there are a light tower, poles and power lines, and various fences and gates.
In order to expand its operation at Bellman's Yard, the railroad decided to double the acreage now used in this project, so that 2,000 automobiles could be placed in the freight yard while waiting for the highway carriers to make pickups there for delivery to the consignees. To this end it applied to the borough building inspector in May 1963 for a building permit to pave the required additional acreage. The permit was denied on the ground that the existing use was contrary to the provisions of the zoning ordinance and such use might be continued to the extent that it was a nonconforming use, antedating the zoning ordinance, but could not be enlarged.
Instead of appealing to the local board of adjustment, the railroad, pressed to meet a deadline set by the auto manufacturers, decided to apply and did on July 15, 1963 apply to the Board of Public Utility Commissioners for an order, pursuant to R.S. 40:55-50, declaring that the zoning restrictions should not apply to the railroad freight yard and its proposed enlargement. After a full hearing, the Board entered an order on August 8, 1963, dismissing the railroad's application "without prejudice," upon its finding that the proofs did not establish that "the present or proposed situation *91 of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public."
The Board of Utility Commissioners is authorized by R.S. 40:55-50 to decide, after hearing held, that a zoning ordinance shall not apply to existing property or to buildings or structures used or to be used by public utilities in furnishing service, if it finds that the "proposed situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public."
Meanwhile, on July 25, 1963, the railroad had applied for and obtained a building permit for land clearing and paving. Ridgefield restricted this permit by providing: "No cars to be use [sic] on Paving." The railroad subsequently completed the additional paving, but Ridgefield maintains that the new paving may not be used for the placement thereon of these new automobiles being transported under this railroad-highway carrier arrangement. Ridgefield relies upon a provision in its zoning ordinance, Article IV, section 8.3(i), which expressly prohibits in Industrial District F, wherein this freight yard is located, the use of property for "outdoor storage of motor vehicles, trucks, trailers and flatcars." That same prohibition applies impliedly in the other zones of the municipality where such a use is not listed among the only permitted uses in those zones.
The chief of the Ridgefield police department filed a complaint against the railroad on September 17, 1963, charging it with using its property in Ridgefield in violation of "Ridgefield Zoning Ordinance No. 691, Section 3, subsection 8.3(I)." This is the section prohibiting "outdoor storage of motor vehicles" in Industrial District F. Later, on October 2, 1963, the assistant building inspector of Ridgefield, filed another complaint, charging that the railroad "did construct and create a structure at the property known as Bellman's yard without obtaining a permit all of which is contrary to and in violation of Ridgefield Borough Ordinance 182 Art. III Sec. 1." The "structure" referred to is the area graded to *92 a slope or rise used to load autos onto the highway trailers. As noted above, these municipal court actions have been held in abeyance pending our disposition of the legal issues involved herein.

I.
We turn our attention first to the fundamental question whether a municipality may, in the exercise of its police powers and through the medium of a zoning ordinance, prohibit the "outdoor storage of motor vehicles" within certain zones or throughout the entire municipality. We find that it may do so, as Ridgefield has done in this case.
A municipality has the unquestioned power to control the use of property by zoning regulations. R.S. 40:55-30 et seq. Of course, the power must always be exercised within statutory limits and for a legitimate zoning purpose. We are not concerned with the wisdom or lack of wisdom of the particular regulation. Judicial review of a zoning ordinance duly adopted by a municipality is confined to a narrow sphere. There is a presumption in favor of the validity of the ordinance which can be overcome by an affirmative showing that the ordinance is arbitrary or unreasonable. Vickers v. Township Com. of Gloucester Tp., 37 N.J. 232, 242 (1962).
In Vickers, supra, a zoning ordinance prohibiting trailer camps and trailer parks in the industrial district, as well as in all other districts, was upheld as valid. In Fanale v. Borough of Hasbrouck Heights, 26 N.J. 320 (1958), the zoning ordinance, prohibiting further construction of apartment houses anywhere in the borough, was deemed a proper exercise of the zoning power. As the court there noted, at p. 325: "It cannot be said that every municipality must provide for every use somewhere within its borders." In Pierro v. Baxendale, 20 N.J. 17 (1955), a zoning ordinance was sustained which barred motels from all districts in the municipality. So, too, in Duffcon Concrete Products, Inc. v. Borough of Cresskill, 1 N.J. 509 (1949), it was held that a municipality *93 could through its zoning ordinance permit light industry and totally exclude heavy industry. See, also, United Advertising Corp. v. Borough of Metuchen, 42 N.J. 1 (1964), upholding a zoning ordinance prohibiting outdoor advertising signs other than those related to business conducted on the premises.
A prohibition against the "outdoor storage of motor vehicles" comes within the legitimate objectives of the zoning law. R.S. 40:55-32. The general welfare is one of such objectives. So, too, is the public safety. One need but view a row of used car lots along a main highway to realize the aesthetic impact of openly stored automobiles and the harmful effect upon the enjoyment and value of property. The classification between outdoor storage and indoor storage of automobiles is not arbitrary or unreasonable. There are obvious differences justifying the classification. We find no arbitrariness or unreasonableness in the particular zoning provision under review. We regard it as valid.

II.
The next inquiry is whether the zoning prohibition against the "outdoor storage of motor vehicles" is applicable to the railroad's operation at Bellman's Yard. We conclude that it is not applicable.
We are mindful of the fact that public utilities are subject to the municipal zoning power. N.J.S.A. 40:55-30 authorizes municipalities to limit, restrict and regulate the uses of land within their borders. The lands of public utilities are not ipso facto exempt from the zoning regulations. By R.S. 40:55-50 the Legislature created a method for resolving conflicts between different interests and policies, the "public" served by the utility on the one hand and the limited group benefited by the zoning ordinance on the other. "This exemption section expresses a legislative intent that, in the zoning field, at least some power over a utility is reserved to a municipality, subject to the supervisory authority of the Board [of Public Utility Commissioners] to declare the local *94 regulation inapplicable," upon making the necessary determination prescribed therein. In re Public Service Electric and Gas Co., 35 N.J. 358, 373-374 (1961).
As we stated in In re Application of Hackensack Water Co., 41 N.J. Super. 408, 422-423 (1956):
"The proper regulation of public utilities and the enforcement of the obligations of proper service are obviously matters of more than local concern. A utility rarely confines its sphere of operation to the boundary lines of one political subdivision. The performance of its obligations to the public and the power of the board [of public utility commissioners] to compel such performance in the interest of the general public good cannot be thwarted by contrary action of one municipality, which might well be inclined to view a situation only from the standpoint of its own citizens."
Thus, R.S. 40:55-50 makes clear the legislative intent that "such local regulation, however beneficent and important, is of secondary importance to the broader public interest" served by the utility. Id.
The borough itself recognized the non-applicability of its zoning regulations to the facilities of public utilities. Ordinance No. 691, amending Article IV, provides in section 8.1(e):
"In Industrial District F, the following uses are permitted by right:

* * * * * * * *
e. public utility facilities, including pumping stations, metering stations, electrical switching stations, electrical substations, electrical generating plants." (Italics ours)
A railroad is a public utility and its freight yard is a facility of the railroad. The listing of some kinds of public utility facilities in section 8.1(e) does not make the provision limited only to those listed. See Cuna v. Board of Fire Commissioners, Avenel, 42 N.J. 292 (1964), as to the legal effect of the word "include," or "including" in a legislative enactment.
Even were there doubt as to whether the exemption of "public utility facilities" applied to the freight yard of a railroad, the doubt must be resolved in favor of the property owner. As we said in Township of Maplewood v. Tannenhaus, *95 64 N.J. Super. 80, 89 (1960), certification denied 34 N.J. 325 (1961):
"Penal and restrictive laws and ordinances must be strictly construed. All doubts as to their applicability must be resolved in favor of a defendant charged with violation thereof. It is offensive to fundamental concepts of justice and violative of due process of law, as a matter of substance to impose sanctions for violations of laws, whose language is doubtful, vague, and uncertain. Zoning limitations on the use of private property should be clearly and expressly imposed, and should not be left to inference."
So, too, as stated in Jantausch v. Borough of Verona, 41 N.J. Super. 89, 104 (Law Div. 1956), affirmed 24 N.J. 326 (1957):
"* * * the legislative power must be exercised by the municipality itself; it may not ask the courts to write a better or a different ordinance. And it should speak clearly * * * especially in view of the predicament of the citizen who seeks in good faith to utilize his property."
Therefore, the use "by right" in Industrial District F of "public utility facilities" is deemed to include the railroad freight yard and, as sanctioned by section 8.1(f), "accessory uses and buildings * * * incidental to the principal use."
Moreover, the word "storage" in the zoning prohibition against "outdoor storage of automobiles" is also of doubtful applicability here and requires resolution of the doubt in favor of the railroad for the reasons above set forth.
The temporary placement for a day or two of these new automobiles in Bellman's Yard, during the process of unloading them from freight cars and reloading them on highway carriers for continued shipment to the consignees, is not a "storage" of the motor vehicles within the real or conventional meaning of that term. These automobiles are freight being transported, probably in interstate commerce, from the manufacturers to the auto dealers. If these new cars were shipped in boxed or crated form, their character as freight would be more obvious and their temporary deposit in *96 the freight yard for pickup by motor carriers would hardly be regarded as a "storage" in the freight yard during the short interval between the unloading from the railroad's freight cars and the reloading on other forms of carriage for continued transportation to their ultimate destination. The more modern handling of automobiles by the combination employed herein does not alter the basic nature of the automobiles as freight.
The brief stay of the new automobiles in the freight yard is more analogous to a "parking" of them there rather than to a "storage" because of the transient character of their stay. They are moving into the yard and moving out again in a brief time, much as automobiles keep moving in and out of a large and busy parking area. The fact that a large number of cars is present each day in the freight yard does not mean that they are "stored" there any more than would the daily presence of a large number of automobiles in a parking area. There are different vehicles from day to day. The local ordinance does not prohibit the outdoor "parking" of automobiles, but only their "storage." There is a substantial distinction between parking and storage. The former connotes transience, the latter a more lasting stay. Prohibition of the latter does not embrace a prohibition of the former, under the strict construction rule applicable to the interpretation of penal laws and regulations restrictive of the use of private property.
The distinction between the "parking" and "storage" of motor vehicles, as applied to a zoning ordinance, was recognized by the New York Court of Appeals in Monument Garage Corporation v. Levy, 266 N.Y. 339, 194 N.E. 848 (Ct. App. 1935). In that case, the zoning ordinance prohibited use of a building or premises for "storage" of more than five motor vehicles. It was held that the ordinance did not prohibit use of the premises for "parking" of motor vehicles, since "storage" connotes a certain degree of permanency whereas "parking," or a place for the standing of a vehicle unattended by a person capable of operating it, connotes transience. Thus, *97 as the court remarked, 194 N.E., at p. 850, "There is a substantial distinction, clearly cognizable, between the meaning of `storage' and `parking.' One has a certain degree of permanency, while the other connotes transience." In accord, Service Realty Corp. v. Planning and Zoning Bd., 141 Conn. 632, 109 A.2d 256, 260 (Sup. Ct. Err. 1954). In contrast, see Incorporated Village of Great Neck v. Green, 166 N.Y.S.2d 219, 221 (Sup. Ct. 1957), holding that when automobiles, not ready for use, are left for months at a given place, they are stored and not parked. "Parking is of short duration and measured by hours or at most by a day or two." Id.
The zoning prohibition against outdoor storage of motor vehicles was adopted prior to the conduct of this unloading and reloading operation at the freight yard, so that it cannot fairly be said that the restriction was intended to ban this relatively new practice at Bellman's Yard. It is reasonable to assume that the prohibition was aimed at the used car lots and storage of new automobiles in areas adjacent to dealers, rather than to a situation which didn't exist when the regulation was adopted.

III.
Our determination that the zoning prohibition in issue is inapplicable to the railroad's use of its Bellman's Yard in handling the transportation of the new automobiles makes it unnecessary for us to determine whether the Board of Public Utility Commissioners improperly dismissed without prejudice the railroad's application for relief from the zoning ordinance under R.S. 40:55-50.
The Board acknowledged that the railroad needed more freight yard space for the handling of this expanding railroad business. There was no finding that enlargement of the present facilities in Ridgefield was not suitable, or that this expanding railroad business might be carried on better or with less deleterious effect elsewhere. The dismissal was based *98 solely upon the railroad's failure to negate the existence of some alternative site where the additional need could be satisfied. In dismissing without prejudice, the Board gave the railroad the opportunity to submit additional testimony which would show the absence or undesirability of possible alternative suitable locations along the railroad's right of way. It seems to us that the railroad could have done so with relative ease in the light of the existing facilities at Bellman's, noted above, where an increase in the paving alone was required. The railroad chose not to avail itself of this opportunity, feeling that it had presented adequate proof that the present and proposed situation at Bellman's Yard made the relief sought reasonably necessary. From the railroad's point of view, the Board was merely requiring it to set up straw men and knock them down.
The Board's decision was evidently influenced by what we said in In re Application of Hackensack Water Company, supra, 41 N.J. Super., at p. 426, wherein we stated that one of the criteria for resolving the issue of reasonable necessity "is the availability of other locations, not municipally restricted, or, if so, less likely to cause injury to the neighborhood, and their comparative advantages and disadvantages with the plot for which approval is sought." See, too. In re Public Service Electric and Gas Co., 35 N.J. 358, 377 (1961). We went on to say, however, "No hard and fast rule may be laid down on this score. We do not think it obligatory on the utility to set up a lot of straw men and then knock them down." 41 N.J. Super., at p. 426.
In other words, evidence as to the availability of other locations and their comparative advantages and disadvantages should ordinarily be tendered by the petitioner for relief under R.S. 40:55-50. If such evidence had been offered here, the Board may very well have granted the application. But such proof is not a mandatory procedural requirement, the absence of which would warrant an automatic dismissal of the application. On the record before it in this case, the Board could have found, if this zoning provision were applicable, *99 that the railroad's present or proposed situation was reasonably necessary for the service, convenience or welfare of the public served by the railroad.
The borough's real concern herein is with the traffic generated by this railroad operation and the probable worsening of conditions on its limited highway facilities in this area by an enlargement of similar activity at Bellman's Yard. This is a proper matter for local concern. However, the same traffic problem would exist if other types of freight were being hauled over the same roadway, or if the same automobiles were transported on the highway carriers without the short delay in the reloading operation. The solution of the traffic problem may not be accomplished by the enforcement of an inapplicable ordinance or one of very doubtful applicability. The railroad suggests that, if its handling of this freight is or becomes excessive, the borough may seek relief from the Board of Public Utility Commissioners, whose supervisory authority is sufficient to curb any excesses by the railroad. We pass no judgment upon the availability or practicality of such a remedy, or of any other remedy. We decide only the issues necessary for determination on this appeal.
The ordinance provision, prohibiting the "outdoor storage of motor vehicles," is valid, but it is not applicable to the facts of this case. Accordingly, the two complaints pending in the municipal court against the railroad will be dismissed. Since relief under R.S. 40:55-50 was not necessary or appropriate, because of the non-applicability of the ordinance restriction, the railroad was not prejudiced by the action of the Board of Public Utility Commissioners in dismissing its application. Therefore, that judgment will stand. No costs by any party as against the other.