NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1096-12T4

NEW JERSEY NATURAL GAS
COMPANY,

     Plaintiff-Respondent,

v.

BOROUGH OF RED BANK and
RED BANK RIVERCENTER
SPECIAL IMPROVEMENT DISTRICT,

     Defendants-Appellants.
_____

APPROVED FOR PUBLICATION

October 28, 2014

APPELLATE DIVISION

Argued March 4, 2014 — Decided October 28, 2014

Before Judges Messano, Hayden and Rothstadt.

On appeal from the Superior Court of New
Jersey, Law Division, Monmouth County,
Docket No. L-1196-12.

Daniel J. O'Hern, Jr., and Joseph J. Colao,
Jr., argued the cause for appellants (Byrnes
O'Hern, L.L.C., attorneys for appellant
Borough of Red Bank; Lindabury, McCormick,
Estabrook & Cooper, P.C., attorneys for
appellant Red Bank Rivercenter Special
Improvement District; Mr. O'Hern and Mr.
Colao, on the joint brief).

Kevin H. Marino argued the cause for
respondent (Marino, Tortorella & Boyle,
P.C., attorneys; Mr. Marino, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

The Borough of Red Bank ("Red Bank") and the Red Bank RiverCenter Special Improvement District ("RiverCenter," and collectively, "defendants") appeal from the October 17, 2012 order of the Law Division that granted plaintiff, New Jersey Natural Gas Company ("NJNG"), summary judgment and denied defendants' cross-motions for summary judgment.[1] The order provided NJNG with declaratory relief, as well as relief in the nature of mandamus against Red Bank, specifically requiring the borough to issue construction permits so that NJNG could "remove all underground [gas] regulators located in . . . Red Bank and replace them with above-ground regulators."

Defendants contend that the trial judge erred by concluding that, pursuant to N.J.S.A. 48:9-17, NJNG's installation of above-ground gas regulators in public sidewalks was largely exempt from municipal control. That statute provides:

> Every [gas] company may lay conductors and install related facilities for conducting gas through the streets, alleys, squares and public places in any municipality or municipalities in which it may lawfully operate, having first obtained the consent by resolution or ordinance of the governing body of such municipality for the furnishing of gas therein and the approval of such consent by the Board of Public Utility Commissioners. The consent may be subject

[1] NJNG is a natural gas distribution company that serves approximately 495,000 customers in 105 municipalities in Monmouth, Ocean, Middlesex and Morris counties.

<u>to reasonable regulations with respect to the opening of streets, alleys, squares and public places, not inconsistent with the provisions of this article</u>.

[<u>Ibid.</u> (emphasis added).]

Defendants further argue that because the judge misconstrued this statute, he erred in not granting defendants summary judgment and dismissing NJNG's complaint in lieu of prerogative writs. They contend that NJNG was required to exhaust its administrative remedies, first by submitting a development application pursuant to Red Bank's planning and development regulations. If NJNG remained dissatisfied with the result, Red Bank contends the utility's remedies were set forth in the Municipal Land Use Law ("the MLUL"), <u>N.J.S.A.</u> 40:55D-1 to -163, a section of which provides:

> If a public utility . . . is aggrieved by the action of a municipal agency through said agency's exercise of its powers under this act, . . . an appeal to the Board of Public Utilities . . . may be taken . . . without appeal to the municipal governing body pursuant to [<u>N.J.S.A.</u> 40:55D-17][2] unless such public utility . . . so chooses. . . . A hearing on the appeal of a public utility to the Board of Public Utilities shall be had on notice to the agency from which the appeal is taken and to all parties primarily concerned, all of whom shall be afforded an

---

[2] <u>N.J.S.A.</u> 40:55D-17 permits "[a]ny interested party [to] appeal to the governing body any final decision of a board of adjustment approving an application" for a type (d) variance pursuant to <u>N.J.S.A.</u> 40:55D-70(d).

3

opportunity to be heard. If, after such hearing, the Board of Public Utilities shall find that the present or proposed use by the public utility . . . of the land described in the petition is necessary for the service, convenience or welfare of the public . . . a finding by the board that the present or proposed use of the land is necessary to maintain reliable . . . natural gas supply service for the general public and that no alternative site or sites are reasonably available to achieve an equivalent public benefit, the public utility . . . may proceed in accordance with such decision of the Board of Public Utilities, any ordinance or regulation made under the authority of this act notwithstanding.

. . . .

Nothing in this act shall be construed to restrict the right of any interested party to obtain a review of the action of the municipal agency or of the Board of Public Utilities by any court of competent jurisdiction according to law.

[N.J.S.A. 40:55D-19.]

Alternatively, defendants argue that the judge should have declined jurisdiction over the dispute and referred the parties to the Board of Public Utilities (the "BPU") pursuant to the doctrine of primary jurisdiction. See, e.g., Curzi v. Raub, 415 N.J. Super. 1, 20 (App. Div. 2010) (quoting Borough of Haledon v. Borough of N. Haledon, 358 N.J. Super. 289, 301-02 (App. Div. 2003) ("Under the doctrine of primary jurisdiction, a 'court declines original jurisdiction and refers to the appropriate

body those issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'")).

NJNG contends the trial judge properly determined that, pursuant to N.J.S.A. 48:9-17 and binding Supreme Court precedent, a municipality -- under the guise of exercising its zoning powers -- may not dictate the manner in which gas service is provided, and that all Red Bank may require is compliance with "reasonable regulations with respect to the opening of streets, alleys, squares and public places." Ibid.

We have considered these arguments in light of the record and applicable legal standards. We reverse.

I.

A.

Much of the record evidence is undisputed. In 1969, Red Bank passed a resolution authorizing NJNG to "to lay, maintain and operate its conductors, mains, and pipes, together with the appurtenances thereto, in all the public streets, alleys, squares and public places" in the municipality. The resolution included the condition that

> [NJNG] shall agree that, in all cases in which street openings or excavations are made for the purposes aforesaid, the pavement and the surface of the streets, alleys, squares or roadways shall be restored to the same condition as existed

> prior to the opening thereof, and in
> accordance with Borough [o]rdinances.

[(Emphasis added).]

RiverCenter was established in 1991 to revitalize Red Bank's downtown business district, which had suffered decline. One of its signature efforts was a $1,800,000 streetscape project, completed in 1998, that installed brick sidewalks, decorative street lights and benches, substantially upgrading the appearance of the downtown area. A second streetscape project was completed in 2002.

In March 2011, NJNG obtained a construction permit to open the street and sidewalk in front of a restaurant on Broad Street in RiverCenter's special improvement district. NJNG thereafter removed a gas regulator from the underground pit in the street and reinstalled it on the sidewalk in front of the restaurant. Red Bank's borough administrator, Stanley Sickels, certified that although NJNG's representative had tried to schedule a meeting with him, no meeting had occurred before NJNG installed the new regulator, and Red Bank was unaware of NJNG's intentions when it issued the permit.

The new regulator protruded approximately 15 inches from the front of the building, through the sidewalk pavers and into the public right of way, i.e., the sidewalk. Sickels, who also served as Red Bank's construction code official and fire

6

marshal, was concerned that the newly installed regulator was a potential safety hazard for pedestrians, would interfere with maintenance of the sidewalks and building facades and was subject to impact damage and vandalism.

On March 22, 2011, Sickels met with NJNG's representatives, Howard Brey and Holly McGovern. There is a factual dispute as to what exactly occurred at the meeting.

In its verified complaint, NJNG claimed that following a system-wide survey of its underground regulators, it had concluded that replacement with above-ground regulators would be necessary because of corrosion problems that compromised safety. At the March 22, 2011 meeting, NJNG representatives showed Sickels and Nancy Adams, RiverCenter's executive director, pictures of corroded underground installations in another town. According to NJNG, "the Red Bank officials were uniformly receptive to the idea of moving the regulators above ground to address safety concerns and indicated that NJNG would be permitted to proceed with the relocation project."

Sickels certified that he recommended NJNG's representatives meet with RiverCenter's representatives to discuss the issue, and he called Adams, who arrived for the last ten minutes of the meeting. Brey and McGovern advised that NJNG intended to replace all underground regulators in Red Bank with

above-ground installations. Sickels did not recall seeing any pictures, and both he and Adams certified that plaintiff's representatives made no mention of safety concerns. Adams suggested NJNG perform surveys to determine if the regulators could be moved to the side or rear of buildings, as opposed to sidewalks in front. According to Sickels, Brey and McGovern were unreceptive to requests that NJNG examine alternatives.

On March 30, 2011, Red Bank passed a resolution that opposed the relocation project on safety grounds. The resolution demanded that NJNG return the Broad Street regulator to its original location below grade, and suggested that any safety concerns be addressed with more frequent replacement of regulators or improved underground enclosures. Another meeting between NJNG and Red Bank in April failed to produce any agreement.

On August 18, 2011, NJNG's general counsel wrote to BPU's Director of the Division of Reliability and Security with a copy to Red Bank's counsel asking for assistance in "resolving this dispute." She detailed NJNG's investigation after discovery of leaks in underground regulators in Red Bank, leading to the conclusion that it could not safely install underground regulators. She asserted that the "serious and imminent risk"

posed by the corroding regulators rendered NJNG non-compliant with federal regulations.

Red Bank's counsel responded by letter dated September 29. He disputed NJNG's safety concerns, claiming that no leaks had been reported since the underground regulators were installed in 1992, NJNG refused to share the actual results of its survey or previous inspections, and NJNG failed to address safety issues that could result from the placement of regulators aboveground in heavily trafficked areas. He proposed that the regulators could be located in building basements, rather than on sidewalks. Although he did not request a hearing before the BPU, counsel observed that "given the fact-sensitive nature of this dispute, neither the BPU nor any other adjudicative body would be in the position to render a decision . . . without the benefit of a more formal evidentiary hearing."

In February 2012, NJNG submitted multiple applications to open streets and sidewalks in Red Bank; on each application, the purpose of the work was described as "sidewalk reg[ulator] pit renewal" or "sidewalk regulator pit remediation." None of the requests indicated that NJNG intended to place a service regulator in and through the sidewalk. Sickels certified that all were denied because NJNG failed to accurately describe the

nature of the work to be performed and provide a sketch or survey.

B.

On March 14, 2012, NJNG filed a verified complaint in lieu of prerogative writs, along with an order to show cause seeking injunctive and declaratory relief. Among other things, NJNG sought an order directing Red Bank to immediately issue the construction permits, and declaratory judgment "that [NJNG] is lawfully permitted and legally obligated to relocate the underground gas delivery equipment to above-ground locations," and that defendants were prohibited from interfering with the relocation efforts.[3]

It suffices to say that the complaint contained extensive technical support for NJNG's claim that it needed to relocate the regulators aboveground for safety reasons. This included an April 26, 2011 letter from Emerson Process Management, apparently the manufacturer of the regulators at issue, in which it cautioned against using its device "in any below grade installations such as pits or vaults," because that "can cause

---

[3] Count Two of the complaint sought attorneys' fees and costs based upon defendants' alleged malicious and unjustified interference with NJNG's activities. Although he briefly addressed this count when denying NJNG a preliminary injunction, the judge did not specifically address this allegation when he subsequently granted summary judgment. In light of our ultimate holding, this count of the complaint lacks any merit.

10

accelerated corrosion rates in certain regulator components."[4] Also attached to the complaint were orders for repairs NJNG made to gas regulators in Red Bank during 2010.

On April 11, 2012, NJNG re-submitted fifty-five applications for permits to open sidewalks. The applications included sketches, but they continued to omit any reference to the relocation of regulators aboveground, or their size or location. On April 23, citing Red Bank's "Planning and Development Regulations," the borough attorney notified NJNG that Red Bank was denying the applications as incomplete and directed NJNG to submit an application for a development permit.

Red Bank's regulations require the issuance of a development permit prior to the "erection, construction, alteration, repair, remodeling, conversion, removal or destruction of any building or structure." Borough of Red Bank, N.J., Planning & Dev. Regulation, § 25-3.6(a)(1)(c). A "structure" is defined as

> [A]ny combination of materials forming any construction, the use of which requires location on the ground or attachment to something having location on the ground and including, among other things: display stands; fences and walls; gasoline pumps; gates and gate posts; . . . standpipes;

---

[4] It is unclear from the record whether the specific regulators referenced were indeed the same type regulators already installed in underground pits in Red Bank.

> tanks of any kind; . . . towers of any kind
> . . . trellises. The word <u>structure</u> shall
> be construed as though following [sic] by
> the words "or part thereof."
>
> [<u>Id.</u> at § 25-2.]

Development permits are also required for "[t]he construction of any site improvement either above or below ground." <u>Id.</u> at § 25-3.6(a)(1)(i). Lastly, the regulations specifically required that "[a]ll utility lines and necessary appurtenances including . . . gas distribution . . . shall be installed underground within easements or dedicated public rights-of-way." <u>Id.</u> at § 25-8.34.

On June 18, 2012, after considering oral argument, the judge denied NJNG'S request for preliminary injunctive relief. In his comprehensive written opinion, the judge concluded that NJNG had not demonstrated the likelihood of imminent, irreparable harm occasioned by alleged corrosion problems. The judge further took note of two sections of Red Bank's development regulations. "Essential Services" were defined as

> [U]nderground gas . . . transmission or
> distribution systems, including mains,
> drains, sewers, pipes, conduits, cables; and
> including normal above ground appurtenances
> such as fire alarm boxes, police call boxes,
> light standards, poles, traffic signals,
> hydrants, and other similar equipment and
> accessories in connection therewith,
> reasonably necessary for the furnishing of
> adequate service by public utilities or
> municipal or other governmental agencies or

> for the public health or safety or general welfare.
>
> [Id. at § 25-2.3.]

Further, § 25-5.10, entitled, "Non-Applicability," stated:

> The provisions of this Chapter shall not apply to customary underground essential services, except that all facilities such as pumping stations, repeater stations and electric substations, which require a structure above ground or any other above ground appurtenance of any type more than forty (40') feet high, shall require approval as a conditional use . . . .

Based on these sections, the judge concluded that the development regulations "explicitly do[] not apply to 'customary underground essential services' which include gas distribution systems and regulators."

The judge also agreed with NJNG that Red Bank's ordinances clearly set forth what information was required to obtain a permit to open a street or repair a sidewalk, and therefore the issuance of construction permits was a ministerial act that involved no discretion. The judge determined that Red Bank had "fulfilled its ministerial act" when it denied NJNG's permit applications. Nonetheless, he denied granting NJNG "extraordinary [injunctive] relief" without a full hearing on the merits.

On June 13, Red Bank amended § 25-9.3 of its regulations, which defined "Public Utilities" and designated them as

conditional uses. After amendment, the definition of public utilities included "structures or appurtenances that may impact a public sidewalk or right of way." A new subsection of the regulation provided that "[a]ny structure or appurtenance related to or separate from the installation shall not encroach upon or unreasonably interfere with the use of public sidewalks or rights of way."

On June 22, stating further discovery was unnecessary, NJNG sought permission to file a motion for summary judgment, contending that the only issue before the court was

> [W]hether a public utility . . . is entitled <u>as a matter of law</u> to determine the manner in which it will deliver natural gas to its customers, regardless of whether a municipality such as Red Bank interposes a substantive, principled objection to the utility's manner of delivery and proposes an alternative and reasonable method of delivery that is nonetheless unacceptable to the utility.

The judge granted NJNG's request.

NJNG filed its motion for summary judgment, relying in large part on the factual assertions made in its verified complaint. In a supplemental certification, NJNG supplied a letter, dated July 31, 2012, from the BPU's bureau chief of pipeline safety, acknowledging receipt of NJNG's notification that it was temporarily replacing the "current underground regulators with new ones." The letter also set forth BPU's

14

"ongoing concerns" regarding safety issues involving the continued use of regulators in underground pits. Defendants cross-moved for summary judgment, arguing that NJNG was required to submit development applications for the installation of the above-ground regulators, and that NJNG had failed to exhaust its administrative remedies before the BPU.

In his September 24, 2012 written opinion, the judge noted that "[t]he first issue [was] whether the public utility has the sole discretion to determine how that utility provides service to a municipality." Citing N.J.S.A. 48:9-17, the judge concluded that the utility must obtain authority from the municipality to provide the service, but a municipality "does not have the authority to dictate the manner in which such service is provided."

The judge described "[t]he crucial issue" as whether the service regulators were structures subject to zoning regulations, or were exempt because they were part of the gas distribution system. The judge was "convinced" that the service regulators were part of the distribution line, and, therefore, NJNG's installations were not subject to zoning regulations but were only "subject to reasonable regulations with respect to the opening of the streets" and other public places. He reasoned that "just like a private customer cannot regulate the location

of the service regulator at their residence," Red Bank could not regulate, through zoning regulation or otherwise, the location of the gas regulators.

Lastly, the judge concluded N.J.S.A. 40:55D-19 did not apply. He reasoned that because NJNG was not required to obtain a development permit, but only a construction permit to open streets and sidewalks, it could properly seek relief to compel this "ministerial act" in the Law Division.

The judge entered an order that granted summary judgment and declared that: NJNG had sole and exclusive discretion to determine the manner in which it would distribute natural gas service within a municipality; Red Bank had no authority to regulate or dictate the manner of distribution "except for reasonable regulations with respect to the opening of streets, alleys, squares, and public places"; Red Bank had no authority via zoning or any other ordinance "to regulate, effect, influence, or dictate" the location of plaintiff's regulators or its relocation of those regulators to the above ground location; and that neither action was subject to municipal laws, ordinances or regulations "except for reasonable regulations with respect to the opening of streets, alleys, squares and public spaces." The order further provided that NJNG was only

required to obtain construction permits, which Red Bank was ordered to issue within seven days.

The judge denied defendants' motion for a stay. Their application to this court for a stay pending appeal was similarly denied.

## II.

Rather than bringing a frontal challenge to Red Bank's planning regulations themselves, NJNG took a different tack. It argued that pursuant to N.J.S.A. 48:9-17, when it comes to the distribution of its gas, NJNG is exempt from any regulation, save reasonable controls on how and when it opens the streets and sidewalks. Thus, NJNG advanced an argument that Red Bank's obligation to issue a street opening permit was ministerial in nature, the complete antithesis of the discretionary authority a municipality exercises in implementing its planning and development regulations.

Accepting NJNG's characterization of the issue, the trial judge took an expansive view of N.J.S.A. 48:9-17 and concluded that, but for "reasonable regulations with respect to the opening of the streets, alleys, squares and public places," Red Bank could not "dictate the manner in which [gas] service [was] provided."

To some extent, however, this mischaracterized the issue, since Red Bank was not attempting to dictate how NJNG provided its service. In other words, Red Bank was not compelling NJNG to use certain type regulators or requiring that they be placed in certain positions. Rather, Red Bank wanted NJNG to submit a development application - nothing more, nothing less. We view this distinction as critical.

The central issue before us is whether the judge's expansive reading of N.J.S.A. 48:9-17 was correct. In this regard, "[w]e review the law de novo and owe no deference to the trial court . . . if [it has] wrongly interpreted a statute." Zabilowicz v. Kelsey, 200 N.J. 507, 512 (2009) (citations omitted).

We start by noting that "[o]ur overriding goal in interpreting a statute is to determine the Legislature's intent." Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 109 (2004). In this case, we frame the inquiry as whether by enacting N.J.S.A. 48:9-17 the Legislature intended that all aspects of the delivery of gas service be exempt from local land use regulations, except "reasonable regulations with respect to the opening of streets, alleys, squares and public places." Ibid. As noted, NJNG urged that position in the Law Division, and it did the same before us. We reject the argument.

The first step in divining legislative intent is to consider the statute's plain language, Town of Kearny v. Brandt, 214 N.J. 76, 98 (2013), and accord those words "their ordinary meaning and significance." DiProspero v. Penn, 183 N.J. 477, 492 (2005). "[W]e must examine that language sensibly, in the context of the overall scheme in which the Legislature intended the provision to operate[.]" N.J. Dep't. of Envtl. Prot. v. Huber, 213 N.J. 338, 365 (2013). Moreover, "[w]hen interpreting multiple statutes governing the same subject, the Court should attempt to harmonize their provisions." Brandt, supra, 214 N.J. at 98 (citation omitted).

Gas companies are public utilities under the general supervision, regulation, jurisdiction, and control of the BPU, which maintains the same powers over utilities' "property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions" of the Department of Public Utilities Act of 1948 (the "Act"). N.J.S.A. 48:2-1.3; N.J.S.A. 48:2-13(a). Further, unless specifically provided for by the Electric Discount and Energy Competition Act, N.J.S.A. 48:3-49 to -98.4, "all services necessary for the transmission and distribution of electricity and gas, including but not limited to safety, reliability, metering, meter reading and billing, shall remain the

jurisdiction of the [BPU]." N.J.S.A. 48:2-13(d). The Court long ago recognized that "the public interest in proper regulation of public utilities transcends municipal or county lines, and . . . a centralized control must be entrusted to an agency whose continually developing expertise will assure uniformly safe, proper and adequate service by utilities throughout the State." In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 371 (1961) [hereafter, "PSE&G"]. Still, the Court has consistently recognized the inherent tension between a municipality's right to regulate the land within its borders, and the benefit to the public-at-large provided by safe and efficient utility services. "Where the state has thus established an agency of its own [(the BPU)] with plenary power to regulate utilities, it is universally recognized that municipalities cannot properly interpose their local restrictions unless and only to the extent any power to do so is expressly reserved to them by statute." Id. at 372 (emphasis added).

Under N.J.S.A. 48:9-17, gas companies are granted the power to "lay conductors and install related facilities for conducting gas through the streets, alleys, squares and public places in any municipality or municipalities in which it may lawfully operate." Ibid. But, the utility must "first obtain[] the

consent by resolution or ordinance of the governing body of such municipality for the furnishing of gas therein and the approval of such consent by the [BPU] Commissioners." Ibid. Municipal consent "may be subject to reasonable regulations with respect to the opening of streets, alleys, squares and public places, not inconsistent with the provisions of this article." Ibid.

We reject defendants' argument that the statute does not extend to gas regulators or the gas distribution line. The plain meaning of the phrase, "install related facilities," covers what is at issue here, an above ground extension of the gas distribution system. We also do not necessarily accept defendants' argument that the statute only governs underground installations. The statute permits the utility to "lay" conductors, perhaps implying only installations in the ground, but it also permits the utility to "install facilities," which has no such implication. Moreover, the utility may conduct either activity "through the streets, alleys, squares and public places," the plain meaning of which may include both the horizontal laying of pipe in the street as well as the vertical installation of a facility "through" some other public place, like the sidewalk.

However, even if N.J.S.A. 48:9-17 applies to all gas "facilities," above or below grade, it cannot be disputed that

NJNG's decision to install at least some of the regulators through public sidewalks did not comply with its obligations under the 1969 resolution. Under that agreement, once NJNG opened a street or a "public place," like a sidewalk, it was required to restore it to its prior condition. Photographs in the record clearly demonstrate that NJNG did not restore sidewalks to prior conditions since there was now a gas regulator protruding through the sidewalk. Because conditions in the public right of way would inevitably change, NJNG's decision implicated more than the powers accorded to it under the general consent provisions of N.J.S.A. 48:9-17. Hence, the judge's conclusion, that the regulators were part of the distribution system and therefore exempt from regulation other than street opening permits, was mistaken.

More importantly, the trial judge's expansive reading of N.J.S.A. 48:9-17 ignored other provisions of the Act and the MLUL that clearly provide the municipality with more power than simply regulating the opening and closing of streets and public places. For example, N.J.S.A. 48:9-25.4, entitled, "Distribution of natural gas; designation of route," provides:

> Any gas company . . . may construct, lay,
> maintain and use facilities, conductors,
> mains and pipes, with the appurtenances
> thereto, in, through and beyond any
> municipality . . . for the purpose of
> transmitting through the same natural gas

. . . ; provided, that in each case such corporation shall first have obtained a designation by the governing body or official having control thereof, of the public street, road, highway or place, which may be occupied by such corporation for such purpose. If any governing body or official having control of any public street, road, highway or place, after having received from such corporation a request to designate such public street, road, highway or place, for occupancy by such corporation for such purpose, shall fail or refuse to make such designation or to designate a practicable route, the [BPU] Commissioners, upon application by the corporation, and after hearing on notice to such governing body or official, shall make such designation.

[Ibid. (emphasis added).]

Contrary to the trial court's holding that the municipality could play no role in determining the location of a gas company's distribution facility, even on public property, this statute permits the governing body to designate the "public street, road, highway or place, which may be occupied by such corporation for such purpose." Ibid. If the municipality fails to do so, or designates an impracticable route, then the gas company may petition the BPU to designate the route. Ibid.

It is well-recognized that construing a statute so as to render any part of it inoperative, superfluous or meaningless is disfavored. Perrelli v. Pastorelle, 206 N.J. 193, 207 (2011) (citing State v. Schumm, 146 N.J. Super. 30, 34 (App. Div. 1977). aff'd o.b., 75 N.J. 199 (1978)). The trial court's broad

23                                                    A-1096-12T4

interpretation of N.J.S.A. 48:9-17 would seemingly render N.J.S.A. 48:9-25.4 nugatory.

Additionally, both historically and presently, applicable provisions of the MLUL make clear that the Legislature never denied municipalities the ability to exercise at least some of their traditional zoning powers simply because a public utility was involved. N.J.S.A. 40:55-50 was the statutory predecessor to N.J.S.A. 40:55D-19. L. 1975, c. 291, §10, amended by L. 1999, c. 23, § 58. It provided in relevant part:

> This article ["Zoning"] or any ordinance or regulation made under authority thereof, shall not apply to existing property or to buildings or structures used or to be used by public utilities in furnishing service, if upon a petition of the public utility, the board of public utility commissioners shall after a hearing, of which the municipality affected shall have notice, decide that the present or proposed situation of the building or structure in question is reasonably necessary for the service, convenience or welfare of the public.
>
> [See State v. Jersey Cent. Power & Light, 55 N.J. 363, 367 (1970) [hereinafter "JCP&L"] (quoting former N.J.S.A. 40:55-50).]

The Court explained the purpose of N.J.S.A. 40:55-50:

> This exemption section expresses a legislative intent that, in the zoning field, at least some power over a utility is reserved to a municipality, subject to the supervising authority of the Board to declare the local regulation inapplicable if it determines "the situation of the building

> or structure in question is reasonably
> necessary for the service, convenience or
> welfare of the public."
>
> [PSE&G, supra, 35 N.J. at 373-74.]

We interpreted the statute similarly, by noting "that public utilities are subject to the municipal zoning power, but by [N.J.S.A.] 40:55-50 the Legislature created a method for resolving conflicts between different interests and policies -- the 'public' served by the utility on the one hand and the limited group benefited by the zoning ordinance on the other." In re Petitions of Pub. Serv. Elec. & Gas Co., 100 N.J. Super. 1, 12 (App. Div. 1968) (citing N.Y. Cent. R.R. v. Borough of Ridgefield, 84 N.J. Super. 85, 93 (App. Div. 1964)).

The trial judge relied upon the Supreme Court's decision in PSE&G, supra, which NJNG argued was wholly dispositive and demonstrated it was exempt from Red Bank's zoning regulations. NJNG reiterates the argument before us, but we reject it.

At issue in PSE&G, supra, was "the power of a municipality to compel a public utility to carry its high-capacity electric power lines, transmitting current for other than local use, through the municipality by underground installation rather than on overhead structures." 35 N.J. at 361 (emphasis added). After construction of an overhead tower that was part of a multi-municipality distribution line had begun in a private

railroad right-of-way, the Borough of Roselle ("Roselle") adopted a local zoning ordinance compelling the utility to obtain a permit. Id. at 361-62, 366. Additionally, Roselle petitioned the BPU to conduct an investigation of the project, including alternatives to overhead installations. Id. at 363.

The BPU held that the utility was exempt from the local ordinance pursuant to N.J.S.A. 40:55-50. Id. at 373. After Roselle filed its appeal from that administrative determination, it passed another ordinance that specifically required all electric power lines be installed underground. Id. at 363. The utility challenged the ordinance in the Law Division, which granted summary judgment, concluding, as a matter of law, that "the ordinance was invalid as beyond the police power delegated to the municipality, because the Legislature had specifically committed the subject matter to the exclusive jurisdiction of the Board." Id. at 364.

The Court agreed, finding that Roselle had no authority to pass an ordinance "which attempts to do nothing less than regulate the method of transmission of high voltage power." Id. at 372 (emphasis added). In addition, the Court held that the zoning authority reserved to municipalities under former N.J.S.A. 40:55-50 was confined to the "physical 'situation' of a building or structure, like a telephone exchange building, truck

26                                                        A-1096-12T4

garage or water tank," where the regulation does not "substantially affect[] the method of operation and functioning of the utility." Id. at 375 (footnote omitted).

The case before us is distinguishable from PSE&G in critical respects. First, NJNG has not challenged the validity of Red Bank's land use regulations. Instead, it has consistently argued that it is exempt from any regulation. Second, unlike PSE&G, this case does not involve a challenge to the method NJNG has chosen to transmit its gas, only to whether NJNG must subject itself, in the first instance, to Red Bank's development regulations. Third, unlike in PSE&G, where Roselle attempted to impose specific methods of electrical distribution on a portion of a multi-jurisdictional project, the location of NJNG's regulators do not affect distribution of gas to any municipality other than Red Bank. Lastly, in PSE&G, Roselle attempted to impose a certain method of distribution even though the utility was operating in a privately owned right-of-way; here, NJNG has installed the regulators within the public right-of-way.

There is subsequent Supreme Court precedent that support's defendants' position and, in our opinion, is more closely on point. In JCP&L, supra, the utility was convicted in two different municipal courts for violating ordinances by

commencing construction of overhead transmission towers without submitting applications so as to comply with certain land use regulations that 1) provided electrical lines were prohibited uses, and 2) required a site plan be submitted and a variance obtained. 55 N.J. at 366-67. The Court described the utility's position.

> Defendant takes the position, purportedly based on this court's opinion in [PSE&G], that the attempt of the municipalities to apply their zoning ordinances to bulk transmission lines merely passing through the local community to some other place constitutes an effort to regulate the transmission of electrical energy, a field committed to state regulation and beyond local legislative power.[] It is said that local zoning authority to which N.J.S.A. 40:55-50 is applicable can extend only to single buildings or structures having a particular local situs, such as a water tank, or a railroad freight yard. It therefore contends that it may simply disregard municipal zoning provisions affecting bulk transmission lines and make its own binding decision whether it must apply to the Board of Public Utility Commissioners for exemption under the statutory section.
>
> [Id. at 368 (internal citations omitted).]

The municipalities argued that N.J.S.A. 40:55-50 indicated "a legislative intention that some local power through zoning regulation exists as to any utility installation, but with the final 'say-so' resting in the state agency, subject to judicial

review." _Ibid._ The Court generally agreed with the municipalities, stating,

> We have no doubt that the legislative scheme puts the initiative upon the utility to petition the Board for relief under N.J.S.A. 40:55-50 whenever a municipal zoning provision affects any proposed installation or it is claimed that it does, unless the requirement is a purely ministerial one, as, for example, where a building permit would issue as of course without submission and approval of structural or site plans. Otherwise the utility may be prosecuted for violation of the ordinance. The very language of the section . . . evidences the clear intent that the decision should not be the utility's whether local zoning provisions should apply at all or to what extent, be the proposed facility one which has a fixed local situs or a bulk transmission line merely passing through the municipality. The statutory provision for notice to the municipality and a hearing further shows that local interests are to be considered and weighed with the broader public interest in the light of the Board's expertise.
>
> Nothing we said in [PSE&G] was intended to suggest otherwise. We meant no more than to suggest, in discussing a hypothetical zoning ordinance provision which went "to the extent of amounting to attempted local regulation substantially affecting the method of operation and functioning of the utility," such as a prohibition against any overhead electric wires in the municipality, that such a provision might go so far beyond the pale of the local zoning power as to permit the [BPU] to completely nullify it for that reason in a proceeding brought by the utility under N.J.S.A. 40:55-50. There was not the slightest thought intended that

> the utility could make that decision on its own and act ex parte accordingly.
>
> [Id. at 369-70 (emphasis added) (footnotes omitted).]

The Court affirmed JCP&L's convictions for violating the municipal ordinances. Id. at 371.

As already noted, the MLUL's successor statute, N.J.S.A. 40:55D-19, implicitly recognizes a municipality's ability to exercise its zoning powers while at the same time according the utility a special avenue for review before the BPU. It is evident that the Legislature's enactment of N.J.S.A. 40:55D-19 actually increased control over a public utility's use of land within a municipality's borders. As one noted commentator has said:

> It is evident that, as to structures and uses affecting a single municipality, the public utility must now apply to the local zoning board of adjustment if a variance is required or other relief within its jurisdiction, or to the planning board if relief is within its jurisdiction, such as a conditional use permit, is required. Appeal therefrom lies to the [BPU] or to the governing body or courts. . . . Thus, the 1975 act created new powers for the municipalities in dealing with a public utility . . . .
>
> [Cox & Koenig, N.J. Zoning and Land Use Administration, § 21-7.2 (2014).]

NJNG seizes upon the Court's language in JCP&L that development regulations do not apply if the utility's "proposed

installation" requires municipal action that is "purely ministerial." JCP&L, supra, 55 N.J. at 369. The intended installation in this case, however, involved more than what was routinely regulated by a permit to open a street or sidewalk. As already noted above, NJNG's installation of above-ground regulators through public sidewalks went well beyond the power granted by the 1969 franchise resolution because the sidewalks would, in fact, never be returned to their prior condition and stanchions holding utility regulators would now be protruding through the sidewalk and for some fifteen inches from the front of buildings.

We hasten to add that we express no position on how Red Bank's development regulations should be construed, and whether NJNG, therefore, is required to submit a development permit. The MLUL provides that "any interested party affected by any decision of an administrative officer of the municipality based on or made in the enforcement of the zoning ordinance or official map" to appeal to the board of adjustment. N.J.S.A. 40:55D-72(a) (emphasis added). In our view, having received Red Bank's counsel's letter denying construction permits because it failed to apply for a development permit, NJNG was in position to appeal that initial decision to the board of adjustment, and thereafter to the court or the BPU. See N.J.S.A. 40:55D-19.

31                                    A-1096-12T4

Those proceedings could have properly placed before the Law Division the nature, scope and reasonableness of Red Bank's development regulations. Since the trial judge agreed that NJNG was not subject to any regulation, other than those that applied to the opening of a street or sidewalk, no record has been created before the municipal agency or in the Law Division. We believe it would be imprudent for us to construe in the first instance Red Bank's development regulations in relation to NJNG's plan to relocate it gas regulators.

For the reasons stated, we reverse the grant of summary judgment to NJNG and grant defendants summary judgment dismissing the complaint.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1096-12T4